STATE OF NEBRASKA, APPELLEE, V.
JOHN L. LOTTER, APPELLANT.
664 N.W.2d 892

Filed July 11, 2003. Nos. S-01-091 through S-01-093.

James R. Mowbray and Jerry L. Soucie, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, J. Kirk Brown, Marie Colleen Clarke, and, on briefs, Don Stenberg, former Attorney General, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

STEPHAN, J.

In 1995, John L. Lotter was convicted of three counts of first degree murder, three counts of use of a weapon to commit a felony, and one count of burglary. In 1996, a three-judge panel sentenced him to death on each count of first degree murder. He received sentences of incarceration on the burglary and use of a weapon convictions. On direct appeal, this court vacated the sentence on the burglary conviction but affirmed the convictions and sentences on all other charges. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999). In these consolidated cases, Lotter filed motions for postconviction relief, a new trial, and for writ of error coram nobis. All of these motions were denied by the district court for Richardson County, and Lotter perfected these appeals, which were consolidated for briefing and argument.

The consolidated appeals were under submission to this court when, on June 24, 2002, the U.S. Supreme Court decided *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). Lotter then filed motions in this court requesting that his death sentences be vacated and the causes remanded to the district court for imposition of life sentences pursuant to *Ring*. The State resisted those motions. We ordered supplemental briefs and oral argument on the issues posed by *Ring* and additional supplemental briefs on the issues posed by the 2002 amendments to Nebraska's capital sentencing statutes enacted in response to that decision. See 2002 Neb. Laws, L.B. 1.

We deny Lotter's motions to vacate his death sentences based upon our determination that *Ring* does not apply to collateral

challenges to sentences which were final when *Ring* was decided. We affirm the order of the district court denying Lotter's motions for postconviction relief, new trial, and writ of error coram nobis.

## I. BACKGROUND

Lotter's convictions relate to the deaths of Teena Brandon, Lisa Lambert, and Phillip DeVine in Richardson County, Nebraska, in December 1993. A detailed recitation of the facts underlying the convictions is set forth in *State v. Lotter, supra,* and only the facts relevant to our analysis of this postconviction proceeding will be repeated here.

Prior to Lotter's trial, Thomas M. Nissen, also known as Marvin T. Nissen, was convicted in a separate trial of first degree murder in the death of Brandon and second degree murder in the deaths of Lambert and DeVine. *State v. Nissen,* 252 Neb. 51, 560 N.W.2d 157 (1997). Nissen did not testify at his trial. He had not yet been sentenced at the time of Lotter's trial. On Monday morning, May 15, 1995, prior to opening statements in Lotter's trial, the following exchange occurred outside the presence of the jury:

THE COURT: . . . With regard to [Nissen's] Motion to Quash, I had a conversation last night with [Nissen's counsel] and defense counsel —

. . . .

. . . Or prosecution, yes. Excuse me. Now, I'm gonna let them explain to you what's goin' — what the nature of that was, because I think you're entitled to know, in view of your Motion [in Limine]. Okay.

[Prosecution]: Uh — We're negotiating an agreement that would have him [Nissen] testify in this matter; it's not been finalized.

THE COURT: It has not been finalized?

[Prosecution]: No. Oh, yeah, that's right. The — And [Nissen's counsel], I think, agreed to continue his Motion to Quash until such time as Nissen would be called, I think that's the extent of it.

Lotter's counsel testified in these postconviction proceedings that this exchange was the first time he had any knowledge of an agreement that would secure Nissen's testimony at Lotter's trial. The agreement was finalized that evening. According to the terms

of the agreement, Nissen agreed to testify truthfully against Lotter and, in exchange, the State agreed not to pursue the death penalty against Nissen for the murder of Brandon. One term of the agreement referenced a meeting between Nissen's counsel and the trial judge, who also was the presiding judge at Lotter's trial. On May 17, Nissen testified that he and Lotter traveled to Lambert's farmhouse together on December 31, 1993, in search of Brandon in order to kill her and agreed that they would also kill anyone else they found there. Nissen testified that he stabbed Brandon but that Lotter fired the shots that killed all three victims.

Lotter testified in his own defense at trial. He denied any participation in either the planning or perpetration of the murders and stated that he was not present when they were committed. He testified that Nissen had not been truthful in his testimony regarding Lotter's involvement in the crimes and that other witnesses who gave incriminating testimony against him were either lying or mistaken.

In February 1996, a three-judge panel sentenced Lotter to death. We affirmed the murder convictions and capital sentences, as well as the convictions and sentences on the related weapons charges, on direct appeal. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999). Subsequently, on August 3, 1999, Lotter filed pro se verified motions for postconviction relief in each of the murder cases. In those motions, he alleged as grounds for relief (1) that the trial judge engaged in improper ex parte communication, (2) that this court on direct appeal had created a new duty on the part of trial counsel to move for the trial judge's recusal, (3) that his trial counsel was ineffective for failing to move for recusal of the trial judge, and (4) that trial counsel was ineffective for failing to make various evidentiary objections. Lotter requested the appointment of counsel on the same date.

On November 16, 1999, the district court conducted a "preliminary review" of the motions and concluded that Lotter was entitled to an evidentiary hearing on the third and fourth grounds, relating to ineffective assistance of counsel, but was not entitled to an evidentiary hearing on the other grounds. The court also appointed counsel to represent Lotter in the postconviction proceeding.

On December 9, 1999, Lotter, through his appointed counsel, moved to consolidate the three cases and filed an amended motion for postconviction relief in the consolidated proceeding, asserting three additional grounds. Two of the additional grounds were based upon an affidavit of Jeff Haley, who had at one time shared a cell with Nissen. Haley's affidavit was attached to the amended postconviction motion. Haley averred that while they were incarcerated together, Nissen told Haley that he, not Lotter, had fired the shots that killed all three victims. Lotter alleged that this evidence established that his convictions and sentences were obtained through the knowing use of false testimony and were therefore invalid. As an additional ground, Lotter alleged that death by electrocution is unconstitutional. At the same time that he filed his amended motion for postconviction relief, Lotter filed a motion for writ of error coram nobis in the consolidated proceeding, asserting that the statements made by Nissen to Haley were exculpatory both as to Lotter's guilt or innocence and as to his sentences. He also filed a motion for new trial in the consolidated proceedings, based upon the statements allegedly made by Nissen to Haley.

On December 16, 1999, the district court conducted a "preliminary review" of the amended postconviction motion. Noting that it had already made a finding on the first four grounds, the court held that Lotter was also entitled to an evidentiary hearing on the grounds based upon Haley's affidavit, but not upon the ground alleging that the death penalty was unconstitutional.

The evidentiary hearing commenced on October 26, 2000, and was completed on November 22. Lotter's motions for a writ of error coram nobis and for a new trial were joined for consideration at the hearing. Lotter's trial counsel was questioned and testified about the fact that he did not object to various evidentiary matters, which will be discussed in more detail in our analysis of Lotter's ineffective assistance of counsel claims. Trial counsel also testified that at the time of trial, he had no knowledge of an improper ex parte communication between the prosecution and the trial judge. Counsel testified that he interpreted the reference on the record to a communication with the judge regarding Nissen's testimony as merely a procedural matter. He further testified that he interpreted the provision in the State's agreement

with Nissen which referenced a meeting with the judge as referring to a meeting that would take place in the future, prior to Nissen's sentencing. Counsel testified that although the trial judge was generally ruling in Lotter's favor on many issues, he would have moved to recuse if he had known all of the facts regarding arrangements to secure Nissen's testimony against Lotter.

Haley's deposition, taken on October 18, 2000, was offered into evidence for substantive purposes under the penal interest exception to hearsay, Neb. Rev. Stat. § 27-804(2)(c) (Reissue 1995). The State objected to the admission of the evidence based upon relevancy, foundation, and hearsay. The objections were taken under advisement.

Haley testified in his deposition that he was Nissen's cellmate at the Lincoln Correctional Center in 1997. Nissen was reading a book at that time about the Brandon murder and was upset because he felt it contained lies. According to Haley, Nissen showed him the autopsy photographs of the victims and explained and demonstrated in detail how he had shot and killed all three victims. Nissen told Haley that while Nissen was shooting the victims, Lotter was "freaking out and running around," saying, "What are you doing? What are you doing?" According to Haley, Nissen stated that he should have shot Lotter as well, and then there would have been no witnesses.

Lotter attempted to depose Nissen and offer his testimony at the postconviction hearing. On October 23, 2000, Nissen refused to answer deposition questions without an attorney regarding his statements to Haley and his involvement in the murders. After Lotter filed a motion to compel, the district court held that Nissen had no right to an appointed attorney but could retain one at his own expense. The court further ruled that Nissen was bound to answer all questions unless he properly claimed a recognized privilege. On October 31, Lotter again attempted to depose Nissen. Nissen again refused to answer questions, stating that he was in the process of hiring an attorney. On November 14, Lotter attempted to depose Nissen for the third time. At that time, Nissen asserted his Fifth Amendment privilege against self-incrimination and refused to answer questions relating to his statements to Haley or his involvement in Lotter's trial and the murders. At the conclusion of the postconviction evidentiary hearing, Lotter made

an oral motion requesting the court to determine that Nissen had no basis for asserting the privilege and to compel Nissen to answer all questions.

On December 19, 2000, the district court entered its order in these proceedings. With respect to the postconviction claims, the court denied Lotter's ineffective assistance claim based upon trial counsel's failure to move for the recusal of the trial judge, reasoning that trial counsel's failure was based upon strategy and resulted in no prejudice. The court also denied Lotter's ineffective assistance of counsel claims based on the failure to make proper evidentiary objections, finding that Lotter was not prejudiced by any deficient performance of his trial counsel. The court determined that the statements made by Nissen to Haley did not fall within the Nebraska penal interest exception because there were no corroborating circumstances that clearly indicated the trustworthiness of the statements. Because it held that Haley's testimony was thus inadmissible, the court held that Lotter's claim alleging the improper use of Nissen's testimony lacked merit. The court also held that because Nissen could be exposed to a first degree murder charge if Lotter were to be executed on the basis of Nissen's alleged perjured testimony at Lotter's trial, there was a sufficient basis to honor Nissen's claim of Fifth Amendment privilege and he could not be compelled to answer the deposition questions. With respect to the motion for writ of error coram nobis, the court denied relief, concluding that Lotter had not shown that an alleged error of fact with respect to the identity of the actual shooter would have prevented Lotter's conviction. The district court also denied Lotter's motion for new trial.

Lotter then perfected these timely appeals. As noted above, *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), was decided while these appeals were under submission, and Lotter filed motions seeking relief pursuant to *Ring*.

## II. ANALYSIS

### 1. APPLICABILITY OF *RING V. ARIZONA*

This is our second opportunity to address the impact of *Ring v. Arizona, supra,* on an appeal pending at the time of its decision. The first was *State v. Gales,* 265 Neb. 598, 658 N.W.2d 604

(2003), a direct capital appeal in which the defendant had assigned as error the trial court's denial of his motion challenging the constitutionality of Nebraska's capital sentencing statutes as they then existed and requesting a jury determination of sentencing issues. After Gales' appeal was docketed but before it was briefed or argued, the U.S. Supreme Court held in *Ring* that its prior decisions in *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), were irreconcilable and that *Walton* should therefore be overruled to the extent that it allowed a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. The Court concluded that because Arizona's enumerated aggravating factors operate as " 'the functional equivalent of an element of a greater offense,' " the Sixth Amendment requires that the factors be found by a jury. *Ring v. Arizona*, 536 U.S. at 609, quoting *Apprendi v. New Jersey, supra.* In *State v. Gales, supra*, we held that under *Griffith v. Kentucky*, 479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987), the new constitutional rule announced in *Ring* was applicable because Gales had preserved the issue in the trial court and, due to the pending direct appeal, his conviction and sentence were not final when *Ring* was decided.

This case reaches us in a different procedural posture. A criminal conviction is final for purposes of collateral review when the judgment of conviction is rendered, the availability of appeal is exhausted, and the time for petition for certiorari has lapsed. *Allen v. Hardy*, 478 U.S. 255, 106 S. Ct. 2878, 92 L. Ed. 2d 199 (1986); *State v. Reeves*, 234 Neb. 711, 453 N.W.2d 359 (1990), *vacated and remanded on other grounds, Reeves v. Nebraska*, 498 U.S. 964, 111 S. Ct. 425, 112 L. Ed. 2d 409 (1990). Our decision in Lotter's direct appeal became final in January 1999, and his petition for writ of certiorari was denied on June 7, 1999. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999), *cert. denied* 526 U.S. 1162, 119 S. Ct. 2056, 144 L. Ed. 2d 222 (1999). Thus, Lotter's convictions were final more than a year before *Apprendi v. New Jersey, supra*, and more than 3 years before *Ring v. Arizona, supra*. Thus, assuming without deciding that Lotter

properly preserved a *Ring* Sixth Amendment issue in his trial and direct appeal and in this postconviction proceeding, the disposition of his motion for remand depends upon whether the holding in *Ring* applies to a conviction and sentence which were final when *Ring* was decided. The U.S. Supreme Court did not address this retroactivity issue in *Ring*.

Based upon the similarity of the Nebraska statutes under which Lotter was sentenced and the Arizona capital sentencing statutes which were declared unconstitutional in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), Lotter argues that his death sentences were void ab initio and entered without jurisdiction. This argument, however, ignores the existence of *Walton v. Arizona, supra*, in which the U.S. Supreme Court specifically upheld the constitutionality of the Arizona statutes which it subsequently held unconstitutional in *Ring*. *Walton* was the controlling constitutional precedent when Lotter was sentenced and when his convictions became final. By specifically overruling *Walton* "to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty," the Court in *Ring* announced a new constitutional rule. *Ring v. Arizona*, 536 U.S. at 609. We must now decide whether the new rule applies to Lotter's final judgments.

We were presented with a similar issue in *State v. Reeves, supra*, which, like this case, was a postconviction proceeding in a capital case. Reeves argued that the admission of a victim impact statement during the sentencing phase of his trial violated his Eighth Amendment rights, based upon the holding of *Booth v. Maryland*, 482 U.S. 496, 107 S. Ct. 2529, 96 L. Ed. 2d 440 (1987), *overruled, Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991), which was decided after his convictions and sentences became final. In determining whether *Booth* should be given retroactive application, this court applied the test which was first adopted by the U.S. Supreme Court in *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), and later specifically extended to the capital sentencing context in *Penry v. Lynaugh*, 492 U.S. 302, 109 S. Ct. 2934, 106 L. Ed. 2d 256 (1989), *abrogated on other grounds, Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002).

Under this test, a new constitutional rule of criminal procedure will not be applied retroactively to a final judgment on collateral review unless it falls within one of two exceptions. The first exception encompasses new rules which place certain kinds of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe. *Teague v. Lane, supra.* The second exception to the general rule of nonretroactivity is for "watershed rules of criminal procedure" which are " ' "implicit in the concept of ordered liberty." ' " 489 U.S. at 311.

Lotter contends that the *Teague* test is inapplicable to this case because the new rule announced in *Ring* is not procedural, but, rather, substantive in nature. He argues that because *Ring* treats aggravating circumstances in a capital sentencing statute as the " 'functional equivalent of an element of greater offense,' " *Ring* redefines the elements of murder as a capital offense. *Ring v. Arizona*, 536 U.S. at 609. The Arizona Supreme Court recently considered and rejected a similar argument in *State v. Towery*, 204 Ariz. 386, 64 P.3d 828 (2003). The court noted a distinction between substantive rules which "determine the meaning of a criminal statute" and "address the criminal significance of certain facts or the underlying prohibited conduct" and procedural rules which "set forth fact-finding procedures to ensure a fair trial." *State v. Towery*, 204 Ariz. at 390, 64 P.3d at 832, citing *Bousley v. United States*, 523 U.S. 614, 118 S. Ct. 1604, 140 L. Ed. 2d 828 (1998); *Curtis v. U.S.*, 294 F.3d 841 (7th Cir. 2002); and *U.S. v. Sanders*, 247 F.3d 139 (4th Cir. 2001). The Arizona court reasoned that *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), did not announce a new substantive rule because it was simply an extension of the procedural rule announced in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), and

> changed neither the underlying conduct that the state must prove to establish that a defendant's crime warrants death nor the state's burden of proof; it affected neither the facts necessary to establish Arizona's aggravating factors nor the state's burden to establish the factors beyond a reasonable doubt. Instead, [*Ring*] altered *who* decides whether any aggravating circumstances exist, thereby altering the fact-finding procedures used in capital sentencing hearings.

*State v. Towery*, 204 Ariz. at 391, 64 P.3d at 833. We conclude that this reasoning is both sound and consistent with our holding in *State v. Gales*, 265 Neb. 598, 658 N.W.2d 604 (2003), that the amendments to Nebraska's capital sentencing statutes enacted in response to *Ring* constituted a procedural change in the law. In *Gales*, we reasoned that the amendments did not alter the substantive nature of the aggravating circumstances which must be proved beyond a reasonable doubt in order to establish death eligibility, but only changed the law to require that a jury, rather than a judge, make the determination of the existence of aggravating circumstances in the absence of a jury waiver by the defendant. Accordingly, we conclude that the new constitutional rule announced in *Ring* was procedural, not substantive. Whether that rule affects Lotter's death sentences therefore depends upon whether it fits within either of the two exceptions to the general rule of nonretroactivity established by *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989).

The first *Teague* exception is inapplicable because the rule announced in *Ring* clearly does not place any type of primary, private individual conduct beyond the power of the criminal lawmaking authority to proscribe. In determining whether *Ring* falls within the second *Teague* exception, we note that the scope of that exception has been narrowly circumscribed by the U.S. Supreme Court as limited to " 'a small core of rules,' which not only seriously enhance accuracy but also 'requir[e] "observance of those procedures that . . . are implicit in the concept of ordered liberty." ' " *Tyler v. Cain*, 533 U.S. 656, 666 n.7, 121 S. Ct. 2478, 150 L. Ed. 2d 632 (2001), quoting *Graham v. Collins*, 506 U.S. 461, 113 S. Ct. 892, 122 L. Ed. 2d 260 (1993). See, also, *O'Dell v. Netherland*, 521 U.S. 151, 117 S. Ct. 1969, 138 L. Ed. 2d 351 (1997). The U.S. Supreme Court emphasized in *Tyler* that in order to fall within the second *Teague* exception, "[i]nfringement of the rule must 'seriously diminish the likelihood of obtaining an accurate conviction,' and the rule must ' " 'alter our understanding of the *bedrock procedural elements*' " ' essential to the fairness of a proceeding." (Emphasis in original.) *Tyler v. Cain*, 533 U.S. at 665, quoting *Sawyer v. Smith*, 497 U.S. 227, 110 S. Ct. 2822, 111 L. Ed. 2d 193 (1990). The Court has noted that its "sweeping rule" establishing an affirmative right to counsel in all

felony cases announced in *Gideon v. Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963), is an example of the type of watershed rule contemplated by the second *Teague* exception. *O'Dell v. Netherland*, 521 U.S. at 167. Accord *Saffle v. Parks*, 494 U.S. 484, 110 S. Ct. 1257, 108 L. Ed. 2d 415 (1990).

In *Sawyer v. Smith, supra,* the U.S. Supreme Court held that the new rule it announced in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S. Ct. 2633, 86 L. Ed. 2d 231 (1985), that the Eighth Amendment prohibits the imposition of a death sentence by a sentencer that has been led to the false belief that responsibility for determining the appropriateness of the death sentence rests elsewhere, was not retroactively applicable, under *Teague,* to a final judgment under collateral review in a federal habeas corpus proceeding. In *Tyler v. Cain, supra,* the Court held that the new rule announced in *Cage v. Louisiana*, 498 U.S. 39, 111 S. Ct. 328, 112 L. Ed. 2d 339 (1990), *disapproved on other grounds, Estelle v. McGuire*, 502 U.S. 62, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991), that a jury instruction is unconstitutional if there is a reasonable likelihood that the jury understood the instruction to allow conviction without proof beyond a reasonable doubt, was not made retroactive by the subsequent holding in *Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993), that the giving of such an instruction constitutes structural error. The Court in *Tyler* stated the "standard for determining whether an error is structural . . . is not coextensive with the second *Teague* exception, and a holding that a particular error is structural does not logically dictate the conclusion that the second *Teague* exception has been met." *Tyler v. Cain*, 533 U.S. at 666-67. The Court further noted its prior observations that it is unlikely that any " 'watershed' rules" which would fall within the second *Teague* exception have yet emerged. *Tyler v. Cain*, 533 U.S. at 666 n.7, quoting *O'Dell v. Netherland, supra.*

Our research indicates that two other state supreme courts have considered the question of whether the rule announced in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), falls within the second exception to the general rule of nonretroactivity established by *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989). Both courts have concluded that it does not. In *State v. Towery*, 204 Ariz. 386, 64

P.3d 828 (2003), the Arizona Supreme Court determined that *Ring* has no effect on the determination of a defendant's guilt or innocence, but, rather, "prohibits a validly convicted defendant from being exposed to the death penalty unless a jury finds the existence of certain aggravating circumstances." *State v. Towery*, 204 Ariz. at 391, 64 P.3d at 833. The court reasoned that this new constitutional rule could not be viewed as enhancing the accuracy of the determination of aggravating circumstances, as required under the second *Teague* exception, because there was "no reason to believe that impartial juries will reach more accurate conclusions regarding the presence of aggravating circumstances than did an impartial judge." *State v. Towery*, 204 Ariz. at 392, 64 P.3d at 834. Noting that the U.S. Supreme Court in *Ring* stated that " '[t]he Sixth Amendment jury trial right . . . does not turn on the relative rationality, *fairness*, or efficiency of potential factfinders,' " *Towery* also concluded that *Ring* "does not involve a procedure so 'implicit in the concept of ordered liberty' as to constitute a watershed rule." *State v. Towery*, 204 Ariz. at 392, 64 P.3d at 834, quoting *Ring v. Arizona, supra*, and *Teague v. Lane, supra.*

The Nevada Supreme Court employed similar reasoning to reach the same conclusion in *Colwell v. State*, 59 P.3d 463 (Nev. 2002), a postconviction action which was pending when *Ring* was decided. Adopting a relaxed version of the *Teague* test which would permit retroactive application of a new constitutional rule if "it establish[es] a procedure without which the likelihood of an accurate conviction is seriously diminished," the court concluded that the rule established by *Ring* did not meet this standard because "the likelihood of an accurate sentence was not seriously diminished simply because a three-judge panel, rather than a jury, found the aggravating circumstances that supported [the defendant]'s death sentence." *Colwell v. State*, 59 P.3d at 472, 473.

The decision in *Cannon v. Mullin*, 297 F.3d 989 (10th Cir. 2002), further supports the view that *Ring* does not fall within the second *Teague* exception. In that case, the court denied an emergency stay of execution and request to file a second federal habeas corpus petition which sought to challenge Oklahoma's capital sentencing statutes under *Ring*. Prior to *Ring*, a direct appeal and first habeas corpus petition had been finally resolved against the

defendant. The court rejected a claim that *Ring* announced a new substantive rule which was not subject to a *Teague* analysis. Based upon its previous holding in *U.S. v. Mora*, 293 F.3d 1213 (10th Cir. 2002), that *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), announced a new rule of criminal procedure, it concluded that the same was true of *Ring* because "*Ring* is simply an extension of *Apprendi* to the death penalty context." *Cannon v. Mullin*, 297 F.3d at 994.

Because, like other courts, we regard *Apprendi* as the jurisprudential source of the Sixth Amendment principle established by *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), we find further guidance from the manner in which other courts have resolved issues regarding the retroactive application of *Apprendi*. A clear majority of state and federal jurisdictions hold that *Apprendi* may not be applied retroactively to final judgments on collateral review. See, e.g., *Sepulveda v. U.S.*, 330 F.3d 55 (1st Cir. 2003); *Coleman v. U.S.*, 329 F.3d 77 (2d Cir. 2003); *U.S. v. Brown*, 305 F.3d 304 (5th Cir. 2002); *Goode v. U.S.*, 305 F.3d 378 (6th Cir. 2002); *Dellinger v. Bowen*, 301 F.3d 758 (7th Cir. 2002); *U.S. v. Sanchez-Cervantes*, 282 F.3d 664 (9th Cir. 2002); *Cannon v. Mullin, supra*; *U.S. v. Sanders*, 247 F.3d 139 (4th Cir. 2001); *U.S. v. Moss*, 252 F.3d 993 (8th Cir. 2001); *McCoy v. U.S.*, 266 F.3d 1245 (11th Cir. 2001); *State v. Sepulveda*, 201 Ariz. 158, 32 P.3d 1085 (Ariz. App. 2001); *People v. Bradbury*, 68 P.3d 494 (Colo. App. 2002); *Figarola v. State*, 841 So. 2d 576 (Fla. App. 2003); *People v. Gholston*, 332 Ill. App. 3d 179, 772 N.E.2d 880, 265 Ill. Dec. 509 (2002); *Whisler v. State*, 272 Kan. 864, 36 P.3d 290 (2001); *Meemken v. State*, 662 N.W.2d 146 (Minn. App. 2003); *State v. Tallard*, 816 A.2d 977 (N.H. 2003); *Teague v. Palmateer*, 184 Or. App. 577, 57 P.3d 176 (2002). The small minority of courts initially holding to the contrary have had such decisions reversed. See, *U.S. v. Murphy*, 109 F. Supp. 2d 1059 (D. Minn. 2000), *reversed* 268 F.3d 599 (8th Cir. 2001); *People v. Carter*, 332 Ill. App. 3d 576, 773 N.E.2d 1140, 266 Ill. Dec. 70 (2002), *vacated* 204 Ill. 2d 666, 790 N.E.2d 377, 274 Ill. Dec. 1 (2003).

Although the U.S. Supreme Court has not directly addressed the question of whether *Apprendi* can be applied retroactively under *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed.

2d 334 (1989), its recent decision in *United States v. Cotton*, 535 U.S. 625, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002), provides some indication as to whether the Court would regard its holding in *Apprendi*, and by logical extension its holding in *Ring*, as "watershed" rules. *Cotton* involved a direct appeal from a conviction for possession of cocaine with intent to distribute. Following a jury trial in which the defendants were found guilty, the trial judge made a finding as to the amount of cocaine in the defendants' possession, based upon the trial testimony, and pronounced an enhanced sentence dictated by the quantity pursuant to 21 U.S.C. § 841(b)(1)(A) (2000). *Apprendi* was decided during the pendency of the direct appeal, and although the defendants did not raise the issue at trial, the appellate court examined the *Apprendi* issue under the plain-error test of Fed. R. Crim. P. 52(b), which required a determination of whether the error affected the substantial rights of the defendants. The Court concluded that it need not resolve that question, because "even assuming [the defendants'] substantial rights were affected, the error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, 535 U.S. at 632-33. The Court reasoned that in light of the "overwhelming and uncontroverted evidence that [the defendants] were involved in a vast drug conspiracy," a threat to the " 'fairness, integrity, and public reputation of judicial proceedings' " would occur if the defendants "were to receive a sentence prescribed for those committing less substantial drug offenses because of an error that was never objected to at trial." 535 U.S. at 634. As one federal court of appeals has concluded from *Cotton*: "Given that an admitted *Apprendi* error can be excused if the evidence on the factor is overwhelming, it is difficult for us to conclude that *Apprendi* can be considered a watershed decision, representing rights fundamental to due process." *U.S. v. Mora*, 293 F.3d 1213, 1219 (10th Cir. 2002).

■ We conclude that *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), announced a new constitutional rule of criminal procedure which does not fall within either of the *Teague* exceptions to the general rule that such changes in the law do not apply retroactively to final judgments. Therefore, we decline to apply *Ring* to the final judgments which are before us

for collateral review in this postconviction appeal and deny Lotter's motions filed in this court requesting that we vacate his death sentences and remand the causes to the district court with directions to resentence him to life imprisonment.

## 2. POSTCONVICTION CLAIMS

### (a) Standard of Review

■ A criminal defendant requesting postconviction relief must establish the basis for such relief, and the factual findings of the district court will not be disturbed unless they are clearly erroneous. *State v. Hunt*, 262 Neb. 648, 634 N.W.2d 475 (2001); *State v. Gray*, 259 Neb. 897, 612 N.W.2d 507 (2000).

■ In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make such discretion a factor in determining admissibility. *State v. Whitlock*, 262 Neb. 615, 634 N.W.2d 480 (2001).

■ Appellate review of a claim of ineffective assistance of counsel is a mixed question of law and fact. *State v. Davlin*, 265 Neb. 386, 658 N.W.2d 1 (2003).

### (b) Testimony of Marvin Nissen

Lotter alleged in the sixth and seventh grounds of his operative postconviction motion that Nissen testified falsely at Lotter's trial and that such testimony was relied upon by the three-judge sentencing panel which sentenced Lotter to death. Lotter alleged that in 1997, Nissen informed his then-cellmate Haley that Nissen had in fact shot all three murder victims. Lotter alleged that this evidence established that his conviction was invalid because the State knew or should have known that Nissen's testimony at Lotter's trial was false. Lotter further alleged that using Nissen's false testimony to support Lotter's death sentence violated the Eighth Amendment because Haley's testimony established that Lotter was not the principal and that he had no intent to kill. Lotter attempted to depose Nissen for purposes of the postconviction hearing, and Nissen refused to answer any questions relating to his communications with Haley or his testimony at Lotter's trial after pleading the Fifth Amendment. Lotter's motion for writ of error coram nobis also pertains to this issue, in that it alleges that the statements made by Nissen to Haley clearly establish that

Nissen testified falsely at Lotter's trial, and this factual information is material and exculpatory to Lotter both as to his guilt or innocence and sentencing. Lotter's motion for new trial is also based upon the statements allegedly made by Nissen to Haley.

Following the evidentiary hearing, the district court denied the postconviction relief sought with respect to Nissen's testimony and also denied the writ of error coram nobis and motion for new trial. Lotter has assigned five separate errors with respect to these rulings, which we address in turn.

### (i) Assignment of Error A: Admission of Jeff Haley's Testimony

Lotter assigns, restated, that the district court erred when it refused to receive and consider the testimony of Haley regarding statements of Nissen under § 27-804(2)(c) and the decision in *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), and its progeny.

Haley's deposition was offered into evidence at the evidentiary hearing as substantive evidence pursuant to the hearsay exception for statements against penal interest, § 27-804(2)(c). The State objected on grounds of hearsay, relevancy, and foundation. The district court held that Haley's deposition testimony regarding statements made to him by Nissen was inadmissible hearsay that did not fall within § 27-804(2)(c).

Section 27-804 provides:

(2) Subject to the provisions of [Neb. Rev. Stat. §] 27-403 [(Reissue 1995)], the following are not excluded by the hearsay rule if the declarant is unavailable as a witness:

. . . .

(c) A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to civil or criminal liability or to render invalid a claim by him against another, that a reasonable man in his position would not have made the statement unless he believed it to be true. *A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement.*

(Emphasis supplied.) The district court found that Nissen was unavailable due to his assertion of his Fifth Amendment privilege and that the statements made by Nissen to Haley were against Nissen's penal interest. Nevertheless, it held that the statements were inadmissible under the last sentence of § 27-804(2)(c) because there were no corroborating circumstances clearly indicating their trustworthiness.

This court has not previously addressed the nature of the "corroborating circumstances" which would be required to "clearly indicate the trustworthiness" of a hearsay statement under § 27-804(2)(c). However, in *State v. Craig*, 192 Neb. 347, 349, 220 N.W.2d 241, 243 (1974), we noted that the possibility of fabrication of such a statement, "perhaps by a confederate who has nothing to lose, would seem to require care in the admission of such evidence."

The district court defined "corroborating circumstance" in this context as "any separate operative facts, direct or circumstantial that substantiate the trustworthiness of the facts contained in the hearsay statement and are not purely collateral facts dealing with credibility generally." In this regard, the district court examined the testimony offered at Lotter's trial and found nothing to corroborate Nissen's purported statements to Haley. The court also examined Lotter's trial testimony and the general evidence relating to Nissen's credibility and concluded that no corroborating circumstances were present. While we agree that it was proper to consider the trial evidence in determining whether there were corroborating circumstances which would indicate the trustworthiness of Nissen's subsequent hearsay statements to Haley, we conclude that the circumstances under which the proffered statements against penal interest were made are also pertinent to this inquiry.

■ In *Chambers v. Mississippi*, 410 U.S. 284, 300, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), the U.S. Supreme Court held that due process requires that a criminal defendant be permitted to offer, in his defense, the hearsay statements of a third party confessing to the crime with which the defendant was charged where the statements "were originally made and subsequently offered at trial under circumstances that provided considerable assurance of their reliability." In assessing the reliability of the inculpatory hearsay statements at issue, the Court considered

the circumstances in which they were made, i.e., "spontaneously to a close acquaintance shortly after the murder had occurred" and further considered the fact that the inculpatory statements were "corroborated by some other evidence in the case." *Id.* Other courts interpreting language similar or identical to § 27-804(2)(c) have held that in addition to independent corroborating evidence, a court may look to the circumstances surrounding the making of the inculpatory hearsay statement by a third party, including such factors as spontaneity, relationship between the accused and the declarant, whether the statement was subsequently repudiated, whether or not it was in fact against the penal interests of the declarant, and whether the declarant had a motive to falsify. See, *U.S. v. Garcia*, 986 F.2d 1135 (7th Cir. 1993); *Wilkerson v. State*, 139 Md. App. 557, 776 A.2d 685 (2001); *State v. Wardrett*, 145 N.C. App. 409, 551 S.E.2d 214 (2001). We conclude that in determining whether there are corroborating circumstances which clearly indicate the trustworthiness of a statement tending to expose the declarant to criminal liability and offered to exculpate the accused pursuant to § 27-804(2)(c), a court should examine all circumstances surrounding the making of the statement, as well as any other evidence which either supports or undermines its veracity.

Even when considered under this broader test, however, we conclude that the district court did not err in determining that there were no corroborating circumstances that clearly indicated the trustworthiness of Nissen's purported hearsay statements to Haley, his cellmate. The enhanced credibility normally given to a statement which incriminates the declarant is attenuated in this case by the fact that at the time he is alleged to have made the statements to Haley, Nissen was serving life sentences for the crimes for which *both* he and Lotter had been found guilty and convicted. The statements were apparently prompted by published accounts describing his and Lotter's respective roles in committing the crimes. Nissen's purported statements to his cellmate Haley, himself a convicted felon, were inconsistent with Nissen's sworn testimony at Lotter's trial. They are also inconsistent with Lotter's sworn trial testimony that he was not present when the murders were committed and had no knowledge of the crimes. Nissen's statements to Haley could represent the truth. It

is at least equally possible, however, that they are fabrications by a convicted felon with little or nothing to lose for the purpose of exaggerating his involvement in the crimes for the benefit of his cellmate, or to provide his former confederate with a contrived basis for seeking to avoid the death penalty. Because there are no circumstances which "clearly indicate the trustworthiness" of Nissen's statements to Haley, we conclude that the district court did not err in determining that the statements were inadmissible under § 27-804(2)(c).

In addition to his statutory argument, Lotter contends that under *Chambers v. Mississippi*, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973), he had a due process right to present Nissen's statements to Haley. As we have noted, *Chambers* held that due process may require admission of a third party's statements against penal interest exculpating the accused where the statements were made under circumstances that provided considerable assurance of their reliability. Since *Chambers*, many states, including Nebraska, have codified the exculpatory penal interest exception. The requirement in § 27-804(2)(c) that there be corroborating circumstances which clearly indicate the trustworthiness of the proferred hearsay is substantially identical to the *Chambers* requirement of "considerable assurance of . . . reliability." See 410 U.S. at 300. For this reason, we conclude that the due process analysis is encompassed within the statutory analysis and that Lotter's due process rights are protected by the statute and need not be examined independently.

*(ii) Assignment of Error B: Knowing Use of Nissen's False Testimony at Trial*

Lotter assigns, restated, that the district court erred when it failed to vacate the convictions because the State knew or reasonably should have known that Nissen's immunized testimony was false, in violation of the Due Process Clauses of the 5th and 14th Amendments to the U.S. Constitution and the decisions in *Naupe v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959), and *United States v. Agurs*, 427 U.S. 97, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976), and their progeny.

Our case law establishes that it is only the State's knowing use of perjured testimony that violates a defendant's due

process rights. *State v. Howard,* 182 Neb. 411, 155 N.W.2d 339 (1967). See, also, *United States v. Bagley,* 473 U.S. 667, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *United States v. Agurs, supra.* In a postconviction proceeding, the burden is on the defendant to establish that the prosecution knowingly used false evidence in securing the conviction. *State v. Huffman,* 186 Neb. 809, 186 N.W.2d 715 (1971). Based upon our determination that the trial court properly excluded Nissen's purported hearsay statements to Haley, such statements cannot form the basis of any claim that Nissen's trial testimony was perjured.

Nevertheless, Lotter argues that while the statements to Haley constituted "the final, and most complete, piece of the puzzle that established Nissen to be a liar," there were other circumstances reflecting adversely on Nissen's credibility which were known to the State at the time of trial. Reply brief for appellant at 6. However, such evidence would have been equally known to Lotter at the time of trial and on direct appeal. A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal. *State v. Curtright,* 262 Neb. 975, 637 N.W.2d 599 (2002).

In summary, we conclude that there is no competent evidence to support Lotter's postconviction claim that the State knowingly used perjured testimony against him at trial. This assignment of error is without merit.

### (iii) Assignment of Error C: Knowing Use of Nissen's False Testimony at Sentencing

Lotter assigns, restated, that the district court erred when it failed to vacate the death sentences because the State knew or reasonably should have known that Nissen's testimony was false and should not be relied upon to impose death in violation of the 8th and 14th Amendments to the U.S. Constitution, and the decisions in *Johnson v. Mississippi,* 486 U.S. 578, 108 S. Ct. 1981, 100 L. Ed. 2d 575 (1988), *Green v. Georgia,* 442 U.S. 95, 99 S. Ct. 2150, 60 L. Ed. 2d 738 (1979), and their progeny.

For the reasons discussed above, we conclude that there is no evidence that the State used perjured evidence against Lotter at his trial or sentencing hearing. Accordingly, this assignment of error is without merit.

### (iv) Assignment of Error E: Nissen's
### Fifth Amendment Privilege

Lotter next assigns, restated, that the district court erred when it failed to order Nissen to testify when Nissen had no criminal exposure under either the Double Jeopardy Clause of the 5th and 14th Amendments or the terms of the original sentencing deal in violation of Lotter's right under the 6th and 14th Amendments and the decision in *Brown v. Walker*, 161 U.S. 591, 16 S. Ct. 644, 40 L. Ed. 819 (1896), and its progeny.

Nissen was subpoenaed as a witness in this postconviction action but refused to answer deposition questions relating to his conversations with Haley and his testimony at Lotter's trial, invoking his privilege against self-incrimination. When the transcript of Nissen's deposition was offered at the evidentiary hearing, Lotter made an oral motion requesting that the district court compel Nissen to answer all questions that he had refused to answer. Lotter argued that Nissen could not in good faith claim the Fifth Amendment privilege because the agreement he made with the State prior to testifying at Lotter's trial remained in force and required him to testify at this proceeding. The State argued that Lotter had previously attacked the legality of its agreement with Nissen and that we held on direct appeal that since Lotter was not a party to the agreement, he lacked standing to challenge it. In addition, the State argued that the agreement obligated Nissen to testify truthfully only at any criminal proceeding and thus was not applicable to a civil postconviction proceeding.

In its order denying postconviction relief, the district court did not directly address the applicability of Nissen's sentencing agreement with the State. Rather, the court reasoned that the fact that Nissen could be exposed to a separate murder charge pursuant to Neb. Rev. Stat. § 28-303(3) (Reissue 1995) if he willfully lied at Lotter's trial was enough of a real risk to Nissen to honor his claim of Fifth Amendment privilege in this postconviction proceeding. The court thus refused to order Nissen to answer the deposition questions.

On appeal, Lotter argues that the agreement Nissen made with the State prior to testifying at Lotter's trial extends him immunity in this proceeding, and thus he has no " 'reasonable cause to apprehend danger from a direct answer.' " Brief for appellant at

46, quoting *Ohio v. Reiner*, 532 U.S. 17, 121 S. Ct. 1252, 149 L. Ed. 2d 158 (2001). Essentially, Lotter argues that Nissen cannot assert a Fifth Amendment privilege because the agreement he made with the State prior to testifying at Lotter's trial is still applicable. Assuming without deciding that Lotter has standing to assert this position, it is without merit. The agreement provides:

Nissen will agree to testify against John L. Lotter or any other individual when requested to do so by the State *in any criminal proceedings* which concern the events which occurred on or about December 24, 1993 through and including December 31, 1993. He will give complete and truthful testimony and answer all prosecution inquiries to the best of his ability and the State agrees that no testimony or other information or any information directly or indirectly derived from such testimony or other information may be used against . . . Nissen in any criminal case except in prosecution for perjury or giving a false statement.

(Emphasis supplied.) The agreement expressly requires Nissen to give testimony only in "any criminal proceedings." A postconviction proceeding is civil in nature. *State v. Reeves*, 258 Neb. 511, 604 N.W.2d 151 (2000). The agreement therefore does not apply to this action.

The Fifth Amendment privilege against compulsory self-incrimination extends not only " 'to answers that would in themselves support a conviction . . . but likewise embraces those which would furnish a link in the chain of evidence needed to prosecute the claimant.' " *Ohio v. Reiner*, 532 U.S. at 20, quoting *Hoffman v. United States*, 341 U.S. 479, 71 S. Ct. 814, 95 L. Ed. 1118 (1951). " '[I]t need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result.' " 341 U.S. at 20-21, quoting *Hoffman v. United States, supra*. The "inquiry is for the court; the witness' assertion does not by itself establish the risk of incrimination." *Ohio v. Reiner*, 532 U.S. at 21.

Here, the district court reasoned:

Nissen is exposed to a separate first degree murder charge pursuant to *Neb. Rev. Stat. § 28-303 (3)*, if he by willful and

corrupt perjury or subordination of the same, purposely procures the conviction and execution of an innocent person. This real risk to Nissen alone is sufficient to honor his claim of privilege.

(Emphasis in original.) We find no error in this reasoning and therefore conclude that this assignment of error is without merit.

### (v) Assignment of Error D: Writ of Error Coram Nobis

Lotter assigns, restated, that the district court erred when it failed to grant a writ of error coram nobis when (1) Lotter obtained newly discovered evidence that Nissen's trial testimony was false, (2) Nissen refused to testify when confronted with the new evidence, and (3) Nissen was permitted to claim a Fifth Amendment right to remain silent.

The common-law writ of error coram nobis exists in this state under Neb. Rev. Stat. § 49-101 (Reissue 1998), which adopts English common law to the extent that it is not inconsistent with the Constitution of the United States, the organic law of this state, or any law passed by our Legislature. *State v. El-Tabech*, 259 Neb. 509, 610 N.W.2d 737 (2000). The purpose of the writ of error coram nobis is to bring before the court rendering judgment matters of fact which, if known at the time the judgment was rendered, would have prevented its rendition. *Id.* It enables the court to recall some adjudication that was made while some fact existed which would have prevented rendition of the judgment but which, through no fault of the party, was not presented. *Id.* The burden of proof in a proceeding to obtain a writ of error coram nobis is upon the plaintiff, and the alleged error of fact must be such as would have prevented a conviction. *Id.* It is not enough to show that it might have caused a different result. *Id.* The writ cannot be invoked on the ground that an important witness testified falsely about a material issue in the case. *Hawk v. State*, 151 Neb. 717, 39 N.W.2d 561 (1949).

Lotter sought a writ of error coram nobis on the basis of what he contended to be Nissen's "perjured" trial testimony. In denying the writ, the district court concluded that it was not procedurally barred, but that Lotter had not met his burden of proof that there had been an error of fact which would have prevented

his convictions. Assuming without deciding that the motion for writ of coram nobis was not procedurally barred, we conclude that the district court did not err in concluding that it was without substantive merit. Lotter did not prove that Nissen testified falsely at his trial, and even if he had, this fact would not entitle him to a writ of error coram nobis. See *Hawk v. State, supra.*

(c) Ex Parte Communication

Lotter alleged in the first ground of his operative postconviction motion that the trial court engaged in improper ex parte communication with the prosecution. His motion explicitly recognizes that this issue was presented to this court on direct appeal. Lotter alleged, however, that it was the trial judge's obligation to disclose the ex parte communication and that the judge failed to do so. He contends that we incorrectly decided the issue on direct appeal by placing the discovery obligation upon trial counsel.

In our opinion resolving Lotter's direct appeal, we set out the May 15, 1995, exchange that occurred on the record prior to the commencement of Lotter's trial referencing a meeting between the prosecution and the court regarding Nissen's testimony. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 597 N.W.2d 673 (1999). Noting that Lotter's counsel obtained a copy of Nissen's written sentencing agreement by at least May 18, the third day of trial, we also set forth the contents of that agreement. Part of the agreement provided:

> "Prior to the finalizing of any agreement, the State will be party to a meeting between attorneys and [the trial judge] wherein the State will inform the judge of no need for the convening of a three judge panel or the preparation of a presentencing report that may contain evidence of aggravating circumstances. . . ."

*Id.* at 465, 586 N.W.2d at 605. Based on this evidence, we concluded that the communication between the trial judge and the prosecution regarding Nissen's testimony at Lotter's trial was ex parte.

After reaching such conclusion, we cited the rule of *State v. Barker*, 227 Neb. 842, 420 N.W.2d 695 (1988), that a judge who initiates, invites, or considers an ex parte communication

concerning a pending or impending proceeding before the judge must recuse himself or herself from the proceedings when a litigant requests such recusal. We concluded, "Although it appears that the ex parte communication at issue in the instant case might have posed a threat to the trial judge's impartiality . . . we need not determine whether the trial judge should have recused himself, since Lotter did not request the judge's recusal . . . ." *State v. Lotter*, 255 Neb. at 475, 586 N.W.2d at 610. In a supplemental opinion, we addressed Lotter's contention that his due process right to an impartial trial judge was violated by the ex parte communication. *State v. Lotter*, 255 Neb. 889, 587 N.W.2d 673 (1999). Finding that Lotter was never personally apprised of the communication, we held that his due process claim was not waived. We concluded:

"After evaluating Lotter's due process claim, we find it to be without merit. While the threat to the impartiality of the trial judge in this case, as noted above, would be sufficient under Nebraska law to require the judge's recusal upon request, it is not sufficient, under the Due Process Clause, to suggest that the trial judge 'had such a strong personal or financial interest in the outcome of the trial that he was unable to hold the proper balance between the state and the accused.'. . .

"Moreover, our comprehensive review of the record in this case reveals no evidence of actual bias on the part of the trial court. Absent an instance of actual bias on the part of the trial court, we determine that Lotter's due process right to a fair and impartial judge was not violated. . . ."

*Id.* at 892, 587 N.W.2d at 675.

In this postconviction appeal, Lotter asserts two assignments of error with regard to the district court's disposition of his postconviction claims relating to the prosecutors' ex parte communications with the trial judge. We address each assignment in turn.

### (i) Assignment of Error F: Ex Parte Communications

Lotter assigns, restated, that the district court erred when it failed to grant an evidentiary hearing and vacate the convictions based on the improper ex parte communications between the trial judge and the prosecution that were conducted in violation

of the Nebraska Code of Judicial Conduct and the 5th, 6th, 8th, and 14th Amendments to the U.S. Constitution.

The district court held that an evidentiary hearing was not required on Lotter's postconviction claim that his constitutional rights were violated by ex parte communications at his trial, because the issue was decided by this court on direct appeal and therefore not subject to relitigation in a postconviction proceeding. Lotter concedes that this issue was raised and decided on direct appeal, but contends that our analysis was incorrect. He argues that we failed to recognize that the trial judge was required to disclose the ex parte communication pursuant to Neb. Code of Jud. Cond., Canon 3E(3) (rev. 2000), and that it was not the duty of Lotter's counsel to discover it.

We are not persuaded by Lotter's argument that we incorrectly decided this issue on direct appeal. Moreover, we subsequently clarified that the *Barker* recusal rule, which states that " 'a judge, who initiates or invites and receives an ex parte communication concerning a pending or impending proceeding, must recuse himself or herself from the proceedings when a litigant requests such recusal,' " "is premised on evidentiary principles and judicial ethics" and "is not a constitutional right in and of itself." *State v. Ryan*, 257 Neb. 635, 651-52, 601 N.W.2d 473, 486-87 (1999), quoting *State v. Barker*, 227 Neb. 842, 420 N.W.2d 695 (1988). For postconviction relief to be granted under Neb. Rev. Stat. §§ 29-3001 to 29-3004 (Reissue 1995), the claimed infringement must be constitutional in dimension. *State v. Hess*, 261 Neb. 368, 622 N.W.2d 891 (2001). In our supplemental opinion in Lotter's direct appeal, we specifically considered whether the ex parte communications relating to the Nissen sentencing agreement violated Lotter's constitutional rights and concluded that they did not. Upon review, we conclude that this determination was correct. Accordingly, the district court did not err in denying postconviction relief without an evidentiary hearing as to this issue which was considered and resolved against Lotter in his direct appeal.

### (ii) Assignment of Error G: Duty to Move for Trial Judge's Recusal

Lotter assigns, restated, that the district court erred when it failed to grant an evidentiary hearing and vacate the convictions

based on the Nebraska Supreme Court's creation and retroactive application of a duty to move for the trial judge's recusal because of ex parte communications, in violation of the right to proper notice of the law provisions of the Due Process Clause of the 14th Amendment and the decisions in *Bouie v. City of Columbia*, 378 U.S. 347, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964), and *Rogers v. Tennessee*, 532 U.S. 451, 121 S. Ct. 1693, 149 L. Ed. 2d 697 (2001), and their progeny.

In Lotter's direct appeal, we did not reach the issue of whether the trial judge was required to recuse himself because Lotter did not request recusal. *State v. Lotter*, 255 Neb. 456, 586 N.W.2d 591 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999). Lotter claimed in the second ground of his operative postconviction motion that his constitutional rights were violated because our opinion "creat[ed] a duty on the part of trial counsel to move for the trial judge's recusal . . . when then existing statutory and case law imposed no such duty on a litigant or his counsel." The district court denied this postconviction claim without an evidentiary hearing.

The basic premise of Lotter's claim that we created a "new duty" in his direct appeal is simply incorrect. The rule we applied in the direct appeal was clearly stated in at least two prior opinions involving the issue of recusal of a trial judge in a criminal case based upon ex parte communications with the prosecution. That rule, first articulated in *State v. Barker*, 227 Neb. at 847, 420 N.W.2d at 699, provides that "a judge, who initiates or invites and receives an ex parte communication concerning a pending or impending proceeding, must recuse himself or herself from the proceedings *when a litigant requests such recusal*." (Emphasis supplied.) We reiterated this rule in *State v. Jenson*, 232 Neb. 403, 440 N.W.2d 686 (1989), holding that recusal was not required in that case because the record did not establish that an ex parte communication had taken place and that even if it had, the defendant made no request for recusal. With respect to the lack of a request, we cited the well-established principle that "[o]ne cannot know of improper judicial conduct, gamble on a favorable result by remaining silent as to that conduct, and then complain that he or she guessed wrong and does not like the outcome." *State v. Jenson,*

232 Neb. at 405, 440 N.W.2d at 688. We cited and relied upon *Barker* and *Jenson* in Lotter's direct appeal and thus clearly did not create a "new rule" with constitutional implications.

Moreover, as noted, the *Barker* rule does not confer a constitutional right in and of itself. *State v. Ryan*, 257 Neb. 635, 601 N.W.2d 473 (1999). In our supplemental opinion in Lotter's direct appeal, we specifically determined that Lotter's constitutional rights were not impaired by virtue of the fact that the trial judge did not recuse himself. *State v. Lotter*, 255 Neb. 889, 587 N.W.2d 673 (1999). For these reasons, this assignment of error is without merit.

(d) Ineffective Assistance of Counsel

Lotter alleged in the third and fourth grounds of his operative postconviction motion that he received ineffective assistance of trial counsel in violation of his rights under the 6th and 14th Amendments to the U.S. Constitution and article 1, § 11, of the Nebraska Constitution. After conducting an evidentiary hearing on these allegations, the district court denied postconviction relief.

In order to establish whether a defendant was denied effective assistance of counsel, he or she must ordinarily demonstrate that counsel was deficient; that is, counsel did not perform at least as well as a criminal lawyer with ordinary training and skill in the area. Moreover, the defendant must make a showing that he or she was prejudiced by the actions or inactions of his or her counsel; that is, the defendant must demonstrate with reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different. *State v. Long*, 264 Neb. 85, 645 N.W.2d 553 (2002); *State v. Al-Zubaidy*, 263 Neb. 595, 641 N.W.2d 362 (2002); *State v. Brunzo*, 262 Neb. 598, 634 N.W.2d 767 (2001). Lotter's assignment of error with respect to the resolution of his ineffective assistance of counsel claims by the district court is divided into two subparts, which we consider in turn.

(i) *Assignment of Error H.1.: Failure to*
*Move for Trial Judge's Recusal*

Lotter assigns, restated, that the district court erred when it failed to vacate the convictions and sentences of death based on

the ineffective assistance of trial counsel in violation of the 6th and 14th Amendments to the U.S. Constitution because trial counsel failed to move for the recusal of the trial judge following the trial judge's improper ex parte communications with the prosecution.

Lotter argues that if his trial counsel was required to move for recusal of the trial judge in order to preserve the issue of improper ex parte communications, discussed above, counsel was ineffective in not doing so. If counsel had moved for recusal under *State v. Barker*, 227 Neb. 842, 420 N.W.2d 695 (1988), and the motion had been granted, a different judge would have presided over the trial. If the motion had been made and denied, the trial would have proceeded exactly as it did. In any event, the failure to move for recusal was prejudicial to Lotter only if it can be shown that the presiding trial judge was biased, thereby depriving Lotter of a fair trial.

The two prongs of the ineffective assistance of counsel test, deficient performance and prejudice, may be addressed in either order. If it is more appropriate to dispose of an ineffectiveness claim due to the lack of sufficient prejudice, that course should be followed. *State v. Harrison*, 264 Neb. 727, 651 N.W.2d 571 (2002); *State v. Long, supra*. In our supplemental opinion in Lotter's direct appeal, we wrote:

> "While the threat to the impartiality of the trial judge in this case . . . would be sufficient under Nebraska law to require the judge's recusal upon request, it is not sufficient, under the Due Process Clause, to suggest that the trial judge 'had such a strong personal or financial interest in the outcome of the trial that he was unable to hold the proper balance between the state and the accused.'. . .
>
> "Moreover, our comprehensive review of the record in this case reveals no evidence of actual bias on the part of the trial court. Absent an instance of actual bias on the part of the trial court, we determine that Lotter's due process right to a fair and impartial judge was not violated. . . ."

(Citations omitted.) *State v. Lotter*, 255 Neb. 889, 892, 587 N.W.2d 673, 675 (1999). This determination necessarily leads to the conclusion that Lotter could not have been prejudiced by any failure on the part of his trial counsel to move for the recusal of

the trial judge. The fact that no motion for recusal was made therefore cannot serve as the basis of a claim that trial counsel was constitutionally ineffective. This assignment of error is without merit.

### (ii) Assignment of Error H.2.: Failure to Make Proper Motions and Objections

Lotter assigns, restated, that the district court erred when it failed to vacate the convictions and sentences of death based on the ineffective assistance of trial counsel, in violation of the 6th and 14th Amendments to the U.S. Constitution, because trial counsel failed to make proper objections and motions for mistrial following offers of inadmissible evidence, misconduct by the prosecution, and improper arguments by the prosecution.

In his postconviction motion, Lotter asserts seven instances in which his trial counsel allegedly failed to interpose the appropriate objection or motion during trial. Several of these instances were the basis of assignments of error on direct appeal which we rejected on the ground of waiver because no timely objection or motion had been made. Lotter now argues that "trial counsel's inaction resulted [in] prejudice when . . . Lotter's case was affirmed on direct appeal." Brief for appellant at 54. However, in order to establish that counsel was *ineffective* in not making a motion or objection at trial, Lotter must first establish that the motion or objection would have been meritorious. Assuming as we must that the trial court would have sustained a meritorious objection or motion, the correct prejudice analysis is then whether there is a reasonable probability that but for counsel's allegedly deficient performance, i.e., the failure to object or move for mistrial, the result of the trial would have been different. See, *State v. Long*, 264 Neb. 85, 645 N.W.2d 553 (2002); *State v. Al-Zubaidy*, 263 Neb. 595, 641 N.W.2d 362 (2002).

### a. Questioning About "[S]tormy [R]elationship"

Rhonda McKenzie testified for the State at Lotter's trial. McKenzie was Lotter's girl friend at the time of the homicides. During recross-examination, Lotter's counsel asked, "Now, you and [Lotter] have had kind of a stormy relationship, and you've had your arguments. He's yelled at you. Right?" McKenzie responded "Correct." Lotter's counsel then asked if Lotter had

gotten mad at her because he did not think she was telling the truth, to which McKenzie also responded affirmatively. On redirect, the State asked, "Now, this stormy relationship is a nice euphemism for the physical abuse he's inflicted on you . . . isn't it?" Lotter's counsel immediately objected that the comment was improper, prejudicial, and irrelevant, and the trial judge immediately sustained the objection.

In his direct appeal, Lotter assigned that the above question relating to physical abuse by Lotter constituted prosecutorial misconduct that should result in a mistrial. Noting that Lotter's counsel did not move for a mistrial, we held that he had waived the right to assert on appeal that the trial court erred in not declaring a mistrial. Lotter now asserts that the failure to move for a mistrial was ineffective assistance of counsel.

At the evidentiary hearing, trial counsel testified that he had not moved for a mistrial after the "stormy relationship" question because he did not regard the question itself as damaging at that point in his trial strategy. He admitted that he did move for a mistrial at other times during the trial and was aware of the importance of making the motion, but he noted that to continually move for a mistrial in circumstances where the motion was unlikely to be granted "is sometimes counterproductive."

In determining whether counsel's performance was deficient, the standard is whether an attorney, in representing the accused, performed at least as well as a lawyer with ordinary training and skill in the defense of a criminal case. *State v. Billups*, 263 Neb. 511, 641 N.W.2d 71 (2002). When considering whether a counsel's performance was deficient, there is a strong presumption that counsel acted reasonably. *State v. Faust*, 265 Neb. 845, 660 N.W.2d 844 (2003); *State v. Al-Zubaidy, supra.* Trial counsel is afforded due deference to formulate trial strategy and tactics. When reviewing a claim of ineffective assistance of counsel, an appellate court will not second-guess reasonable strategic decisions by counsel. *State v. Al-Zubaidy, supra.*

The district court determined that Lotter's trial counsel made a sound tactical decision not to move for a mistrial in this circumstance, because it was improbable that a mistrial would have been granted and the motion would have highlighted the comment further from the jury's perspective. We agree with this

analysis and conclude that the decision not to move for a mis-trial at this juncture of the trial did not constitute deficient per-formance on the part of defense counsel.

### b. Cross-Examination About Witnesses "[L]ying"

While cross-examining Lotter at trial, the prosecutor repeat-edly asked questions relating to the credibility of various prose-cution witnesses. The prosecutor asked Lotter several times whether another witness was lying when he or she testified in a manner that conflicted with Lotter's testimony. Lotter's trial counsel did not object to this line of questioning. On direct appeal, we held that the absence of an objection precluded Lotter from asserting that the trial court erred in admitting the testimony.

At the evidentiary hearing in this postconviction proceeding, Lotter's trial counsel explained that he did not object in part because of "some ethical considerations as to how far I could go in assisting Mr. Lotter in those responses" and also because Lotter was handling the prosecutor's questions well. In its analy-sis of this issue, the district court found that counsel was defi-cient for not objecting, as it is improper under Nebraska law for a party to ask a witness to comment on whether another witness is lying or telling the truth. See Neb. Rev. Stat. § 27-608 (Reissue 1995). The court held, however, that Lotter was not prejudiced by this cross-examination.

Lotter now argues that "[t]he district court was in error in examining the trial record when the question is whether the fail-ure was prejudicial to . . . Lotter's appeal." Brief for appellant at 57. As noted above, the prejudice analysis conducted by the dis-trict court correctly focused upon whether there was a reasonable probability that the failure of trial counsel to object to these ques-tions affected the outcome of the trial. We agree with its conclu-sion that it did not.

### c. Prosecutor's Statements During Closing Argument

Lotter contends that during the State's closing argument at trial, the prosecutor improperly argued the terms of Nissen's agreement and referred to Lotter as "evil." During his argument, the prosecutor noted with respect to Nissen that "[t]here's no evidence that he's gonna get out in six months" and referred to

Nissen's testimony that he was going to spend the rest of his life in prison. The prosecutor also stated:

> Lotter can only be described in one word. And that word is evil. Evil to put a bullet in the — someone's head because she had the audacity to tell on him. To talk about — To make a rape complaint. How dare she make a rape complaint. He puts a bullet in her head. And it's evil shot Lisa Lambert and then evil that shot Phillip DeVine as he begged for his life, and then went back in that other bedroom and made sure, under the chin and a second shot through Lisa Lambert's head. That's what we're dealing with here. You bet we're dealing with evil. But the evil's on trial. Nissen's trial is done; Nissen's not on trial here. This is evil and this is guilty of seven charges.

On direct appeal, we held that because trial counsel did not object to the comments and move for a mistrial, any claim of reversible error was waived.

Trial counsel testified in the postconviction proceeding that he thought the comment referring to Lotter as "evil" was a characterization of Lotter's actions and was only marginally objectable, and thus he made no objection. The district court held that the comments about Nissen were proper argument, that the reference to "evil" was "no more than hyperbole resulting in harmless prejudice," and that no substantial miscarriage of justice resulted. We conclude that trial counsel's performance in this regard was neither deficient nor prejudicial.

### d. Nissen's Prior Statements

At trial, Investigator Roger Chrans of the Nebraska State Patrol was called as a witness by Lotter. On direct examination, Chrans was asked questions about two statements made by Nissen to investigators within months of the homicides. Chrans testified that in these statements, Nissen did not admit to stabbing anyone. On cross-examination, the State asked Chrans whether Nissen had stated in a magazine article that he had stabbed Brandon and that Lotter had shot the victims. This article was not in evidence. After Chrans responded affirmatively, Lotter's counsel objected but did not move to strike the response. Chrans also testified on cross-examination, without objection,

that Nissen's trial testimony was consistent with prior statements Nissen had made to others. The State asked specific questions relating to Nissen's two earlier statements made to the investigators within months of the homicides, and Lotter's counsel did not object. The questions and answers generally indicated that Nissen's earlier statements were consistent with his trial testimony.

On direct appeal, Lotter assigned as error the introduction of the prior statement of Nissen in the magazine article. Noting that counsel did not move to strike the testimony after objecting, we held that any error was waived. In his motion for postconviction relief, Lotter alleged that his counsel was ineffective for failing to move to strike the testimony concerning the magazine article. At the postconviction hearing, Lotter's trial counsel testified that he did not move to strike this testimony because he thought it was somewhat beneficial in that it demonstrated that Nissen repeatedly changed his story. He further testified that he did not object to testimony about Nissen's prior consistent testimony because it demonstrated a pattern of Nissen's lying. In addition, the record is clear that Lotter's counsel initially adduced testimony relating to Nissen's prior statements. Based on this evidence and the deference we are required to give to counsel's strategic decisions during trial, we conclude that trial counsel did not perform deficiently in this regard. Moreover, Lotter has failed to demonstrate a reasonable probability that the result of his trial would have been different even if such testimony had been stricken.

### e. Testimony That Nissen Was Convicted of Same Murders

The State called Chrans as a witness during its case in chief. Chrans was used to establish a chain of custody for evidence. In response to a question in this context, Chrans testified that he relinquished possession of the gun used in the homicides during the "State versus Marvin Nissen trial." During his direct examination, Nissen testified that he was present at the location of the homicides, that Lotter shot all three victims, and that Nissen stabbed Brandon. Nissen then testified that he had an agreement that he would be sentenced to three life terms. During closing, the prosecutor stated that Nissen testified that he was convicted of one first degree murder and two second degree murders. Lotter

argues that we refused to address these improper references as plain error on direct appeal because no objection was made.

Trial counsel testified at the evidentiary hearing that he was aware of trial testimony suggesting that Nissen had been convicted of the same murders and that at least one Nebraska case had been reversed based upon evidence of a codefendant's conviction. He stated that he did not object to this evidence because he used Nissen's actions in not testifying at his own trial during his cross-examination of Nissen. In this regard, trial counsel stated: "Our decision was that you could not effectively cross-examine . . . Nissen and not address the fact that he had been convicted of one count of first-degree murder and two counts of second-degree murder."

The trial references cited by Lotter do not explicitly state that Nissen was convicted of the same murders. Moreover, trial counsel explained that he decided not to object to testimony on this subject based upon trial strategy. His performance was not deficient and affords no basis for a claim of ineffective assistance.

### f. Cross-Examination of Larry Schott on Prior Convictions

Larry Schott testified on behalf of Lotter. During his direct examination, he testified that he had previously been incarcerated on misdemeanor convictions. On cross-examination, the State elicited details of each prior conviction for dishonesty. On recross-examination, the State elicited testimony from Schott that certain of his prior convictions were for forgery and false use of a financial instrument. Lotter attempted to raise the inadmissibility of this evidence on direct appeal, but we refused to address it because counsel did not object to the questions.

At the postconviction evidentiary hearing, Lotter's counsel acknowledged his awareness that the State's questioning of Schott was improper, but stated that he did not object to the questions because he was attempting to contrast Schott's prior criminal history with that of Nissen. Based on this testimony, trial counsel made a reasonable strategic decision not to object and his performance was not deficient. Moreover, Lotter has shown no prejudice, and thus he has failed to establish ineffective assistance of counsel on this ground.

### g. Testimony of Dr. Reena Roy

Dr. Reena Roy, a forensic serologist, testified on behalf of the State at Lotter's trial. Roy performed a presumptive test on the gloves found with the murder weapons and confirmed that there was some blood present. She testified that she did not conduct further tests to determine if the blood was human because she had received a letter from "the defense attorney" requesting that she save the sample for independent analysis. Lotter sought to raise this issue as plain error on direct appeal, but we declined to address it.

At the postconviction evidentiary hearing, Lotter's trial counsel testified that he did not object to Roy's testimony despite his awareness of case law on the issue of its admissibility. He stated that he did not object because he elected to establish on cross-examination that it was Nissen's counsel who sent the letter to Roy, noting, "That [letter] then fed into my theory that it was . . . Nissen who was trying to keep the evidence from the jury and from law enforcement by stopping Dr. Roy from examining the samples." Based on this evidence, we conclude trial counsel made a reasonable strategic decision, and in any event, Lotter has failed to demonstrate any prejudice. Lotter is not entitled to postconviction relief with respect to this or any of his ineffective assistance of counsel claims.

### (e) Cruel and Unusual Punishment

Lotter alleged in the fifth ground of his operative postconviction motion that death by electrocution will subject him "to needless agony, physical suffering, and degradation in violation of the Eighth and Fourteenth Amendments to the United States Constitution." Citing two 1999 cases from other jurisdictions, Lotter also alleges that death by electrocution as authorized and practiced in Nebraska and other states "has resulted in documented and repeated malfunctioning resulting in ghastly spectacles of violent disfigurement so as to constitute wanton physical, psychological, and moral cruelty in violation of the Eighth and Fourteenth Amendments to the United States Constitution." The district court denied this postconviction claim without an evidentiary hearing.

*(i) Assignment of Error I: Constitutionality
of Death By Electrocution*

Lotter assigns, restated, that the district court erred when it failed to grant an evidentiary hearing and vacate the death sentence because execution by judicial electrocution is in violation of the cruel and unusual punishment protections provided by the 8th and 14th Amendments to the U.S. Constitution.

■ A motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal. *Hall v. State*, 264 Neb. 151, 646 N.W.2d 572 (2002); *State v. Dean*, 264 Neb. 42, 645 N.W.2d 528 (2002). We rejected an Eighth Amendment claim in Lotter's direct appeal, based upon our prior holdings that "Nebraska's death penalty statutes do not constitute cruel and unusual punishment" under the federal or state Constitution. *State v. Lotter*, 255 Neb. 456, 511, 586 N.W.2d 591, 629 (1998), *modified on denial of rehearing* 255 Neb. 889, 587 N.W.2d 673 (1999).

■ In a motion for postconviction relief, the defendant must allege facts which, if proved, constitute a denial or violation of his or her rights under the U.S. or Nebraska Constitution, causing the judgment against the defendant to be void or voidable. *State v. Harrison*, 264 Neb. 727, 651 N.W.2d 571 (2002); *State v. Gamez-Lira*, 264 Neb. 96, 645 N.W.2d 562 (2002). An evidentiary hearing on a motion for postconviction relief is required on an appropriate motion containing factual allegations which, if proved, constitute an infringement of the movant's rights under the Nebraska or federal Constitution. *State v. Zarate*, 264 Neb. 690, 651 N.W.2d 215 (2002); *State v. Dean, supra.* Lotter's motion for postconviction relief includes no specific factual allegations which would warrant reconsideration of our prior decisions holding that death by electrocution as administered in this state is not cruel and unusual punishment. See *State v. Ryan*, 248 Neb. 405, 534 N.W.2d 766 (1995). Accordingly, the district court did not err in denying this claim for postconviction relief without an evidentiary hearing.

III. CONCLUSION

In summary, we conclude that because Lotter's convictions and sentences had become final prior to the decision in *Ring v.*

*Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), they are not affected by the new procedural rule of law established by *Ring*. We therefore deny Lotter's motions filed in this court requesting that the causes be remanded for resentencing. Based upon our review of the record, we conclude that the district court did not err in denying Lotter's various claims for postconviction relief, as well as his motions for writ of error coram nobis and for new trial. The judgments entered by the district court in each of the cases included in this consolidated appeal are hereby affirmed.

AFFIRMED.