State of Nebraska, appellee, v.
Raymond Mata, Jr., appellant.
668 N.W.2d 448

Filed September 5, 2003. No. S-00-600.

James R. Mowbray, Jerry L. Soucie, and Jeffery Pickens, of Nebraska Commission on Public Advocacy, for appellant.

Jon Bruning, Attorney General, and J. Kirk Brown for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

GERRARD, J.

Raymond Mata, Jr., was found guilty by jury verdict of first degree premeditated murder, first degree felony murder, and kidnapping, in association with the death of Adam Gomez (Adam), the 3-year-old son of a woman with whom Mata had had an intimate relationship. Mata was convicted and sentenced to life imprisonment for kidnapping and convicted and sentenced to death for the first degree premeditated murder.

## I. BACKGROUND

Adam was the son of Patricia Gomez (Patricia) and Robert Billie, who had lived together for 5 years before Billie moved out of their Scottsbluff, Nebraska, residence in September 1998. Adam remained with Patricia, although there was no legal custody arrangement. Patricia and Mata began dating shortly thereafter, and Mata moved in with Patricia and Adam in October or November. Patricia later told police that although Mata did not treat Adam badly, Mata consistently expressed resentment of Adam and thought that Adam was "in the way all the time."

Mata moved out of Patricia's residence on February 10, 1999, and moved in with his sister, Monica Mata (Monica). Monica was also Patricia's best friend. That evening, Patricia and Billie spent the night together and had sexual relations. Patricia obtained a restraining order against Mata on February 11, but continued to see Mata, and on February 14, Patricia and Mata had sexual relations.

In late February, Patricia found out that she was pregnant. She told Monica, who in turn told Mata. Mata instructed Monica to accompany Patricia to Patricia's doctor's appointment, to find out when the child was conceived. Patricia was told that the child was conceived between February 7 and 10. Monica told Mata, who told Monica that the child was not his. On March 8, Mata confronted Billie at a party regarding Billie's relationship with Patricia, and on the next afternoon, Mata confronted Patricia, who told Mata about her sexual encounter with Billie.

On March 11, 1999, Patricia and Billie took Adam to a doctor's appointment; they were seen by an acquaintance of Mata who told Mata that the three had been together. Mata made repeated attempts that day to compel Patricia to come to

Monica's residence to visit him. Patricia refused, so that evening, Mata went to Patricia's residence. Adam was watching television until Mata sent him to bed. According to Patricia's testimony, she fell asleep on the loveseat in the living room while Mata watched television. Patricia said that when she woke up, Adam and Mata were gone, as was the sleeping bag that Adam had been using as a blanket.

Patricia telephoned Mata on his cellular telephone at 3:37 a.m. Mata told Patricia that he did not know where Adam was. Mata came to Patricia's residence immediately. According to Patricia, Mata told her that Adam was probably with Billie or Patricia's mother. Patricia went back to sleep, and Mata spent the night. Patricia testified that she attempted to contact Billie and her mother the next day, but was unable to do so immediately. When Patricia's mother called her and asked how Adam was, Patricia told her mother that Adam was fine. Patricia later spoke to Billie, and Billie said that Adam was not with him. Patricia also asked Monica if she knew where Adam was, and Monica said she did not know. Patricia said that at this point, she still thought Adam was with Billie, because Billie had been complaining about not having enough time with Adam. Patricia testified that Mata told her not to call the police, "because they couldn't do anything anyways 'til after 24 hours."

On the following day, Saturday, March 13, 1999, Mata took Patricia to Grand Island, Nebraska, and the two did not return to Scottsbluff until Sunday morning. Sunday night, Mata asked Monica to go to Cheyenne, Wyoming, accompanied by Jesse Lopez, who was the father of Monica's son and who was staying with Monica at the time. They agreed and departed at about 11 p.m., leaving Mata alone in the residence. Monica was unable to locate the person Mata asked her to meet in Cheyenne, and she and Lopez returned home at about 4:30 on the morning of Monday, March 15. After returning, Monica found that the sewerline from the residence was clogged.

That afternoon, Patricia spoke with her sister, who came to Patricia's residence. Mata was there when Patricia's sister arrived. Patricia decided to call the police and report Adam's disappearance. Patricia testified that Mata insisted that she not call the police until after Mata had left "because how I knew he had

a warrant for his arrest, just for me to wait 'til he left." Scottsbluff police were finally notified that Adam was missing at approximately 4 p.m. on March 15, 1999.

Police searching for Adam went to Monica's residence to speak to Mata, but the occupants refused to answer the door. Monica testified that Mata told her not to answer the door because there were warrants out for his arrest. Police discovered a sealed garbage bag in a dumpster behind Monica's residence. When the bag was torn open, police found Adam's sleeping bag and the clothing Adam had been wearing when he was last seen by Patricia. The bag also contained trash identified as being from Monica's residence, including a towel and a boning knife that Monica had not thrown away.

A search warrant was obtained for Monica's residence and executed on March 16, 1999. (The residence had been searched pursuant to a warrant earlier that morning, but the results of the search were suppressed by the district court; the first search is not pertinent to this appeal.) Mata went to the police station to answer questions while the warrant was executed. Mata's mother, Ynez Cruz, picked him up from the police station, dropped him off at a friend's house, and went with Monica to retrieve some of Monica's clothing. The home was still being searched, and the police asked Monica to remove a dog from the residence. Monica and Cruz took the dog and also picked up Mata from the friend's house. Cruz testified that en route to a nearby town, Mata was talking to the dog, telling the dog that it "was being well taken care of and [Mata] was feeding [it] and that he was [its] friend."

Police searching Monica's residence found human remains in the basement room occupied by Mata. Hidden in the ceiling was a package wrapped in plastic and duct tape, which contained a crushed human skull. The skull was fractured in several places by blunt force trauma that had occurred at or near the time of death. The head had been severed from the body by a sharp object, at or near the time of death. No evidence of strangulation could be found, although strangulation, smothering, and blunt force trauma could be neither ruled in nor ruled out as the cause of death.

In the kitchen refrigerator of the residence, police found a foil-wrapped package of human flesh. Mata's fingerprint was

found on the foil. Human remains were also found on a toilet plunger and were found to be clogging the sewerline from the residence. Human flesh, both cooked and raw, was found in the dogfood bowl and in a bag of dogfood. Human bone fragments were recovered from the dog's digestive tract.

All of the recovered remains were later identified, by DNA analysis, as those of Adam. Adam's blood was also found on Mata's boots. No blood was found on Adam's clothing, or the sheets of Adam's bed at Patricia's residence.

At trial, the defense did not deny Mata's attempt to dispose of Adam's body. The defense's theory of the case was that Adam had been killed by Patricia at Patricia's home on Friday, March 12, 1999, and that Mata only attempted to help Patricia dispose of Adam's body and explain his disappearance. Mata did not testify.

The jury found Mata guilty of first degree premeditated murder, first degree felony murder, and kidnapping. A three-judge sentencing panel was convened. The sentencing panel found one statutory aggravating circumstance: that the murder was " 'especially heinous, atrocious, cruel, *or* manifested exceptional depravity by ordinary standards of morality and intelligence.' " See Neb. Rev. Stat. § 29-2523(1)(d) (Cum. Supp. 2002). The panel found no statutory mitigating circumstances to exist, but considered four nonstatutory mitigating circumstances: Mata's ability to adapt to prison conditions, Mata's IQ of 85, Mata's history of substance abuse, and Mata's relationship with his parents.

The panel sentenced Mata to death on the conviction for first degree premeditated murder. The presiding district judge also sentenced Mata to life imprisonment for kidnapping. However, the panel determined that because only one murder was committed, only one sentence for murder could be pronounced, and Mata was neither convicted nor sentenced for felony murder. An appeal was perfected directly to this court. See Neb. Rev. Stat. § 29-2525 (Cum. Supp. 2002). Further factual details will be set forth below as necessary for our discussion of Mata's assignments of error.

## II. ASSIGNMENTS OF ERROR

Mata's operative replacement brief assigns, consolidated and restated, the following as errors:

(1) The trial court failed to suppress all of Mata's statements made during his March 16, 1999, interrogation.

(2) The trial court failed to suppress evidence from Mata's boots, seized following the March 16, 1999, interrogation.

(3) The trial court failed to suppress the necropsy of the dog.

(4) The trial court forced Mata to wear shackles at trial.

(5) The trial court overruled Mata's motions to dismiss the charges of felony murder and kidnapping, although there was insufficient evidence as a matter of law.

(6) The trial court failed to instruct the jury on the essential elements of kidnapping and felony murder, as required by *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

(7) The district court imposed a consecutive life sentence for kidnapping in addition to a death sentence for felony murder in violation of the Double Jeopardy Clause.

(8) There was plain error in the imposition of the death sentence under *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002).

(9) The Nebraska death penalty statutes are unconstitutional in that (a) they fail to provide adequate direction to the sentencer so as to avoid the arbitrary and capricious application of death in violation of the 8th and 14th Amendments to the U.S. Constitution and (b) the assignment of a " 'risk of nonpersuasion' " to the defendant regarding nonstatutory mitigating factors violates the separation of powers provision of the Nebraska Constitution and the 8th and 14th Amendments to the U.S. Constitution.

(10) The Nebraska death penalty statutes are unconstitutional as applied in violation of the 8th and 14th Amendments to the U.S. Constitution.

(11) The " 'exceptional depravity' " aggravating circumstance is unconstitutionally vague, and the acts of dismembering Adam's body were not " 'at or near the time of the murder' " as required by the aggravator.

(12) The Nebraska death penalty statutes are unconstitutional because proportionality review violates the separation of powers provisions of the Nebraska Constitution and are not severable from the Nebraska death penalty scheme.

(13) The sentencing panel did not correctly perform the comparative analysis required by Neb. Rev. Stat. § 29-2519 et seq. (Reissue 1995 & Cum. Supp. 2002).

(14) Judicial electrocution is unconstitutional under the U.S. and Nebraska Constitutions.

(15) The sentence of death was excessive and disproportionate under the facts of this case.

### III. STANDARD OF REVIEW

■ A trial court's ruling on a motion to suppress, apart from determinations of reasonable suspicion to conduct investigatory stops and probable cause to perform warrantless searches, will be upheld unless its findings of fact are clearly erroneous. In making this determination, an appellate court does not reweigh the evidence or resolve conflicts in the evidence, but, rather, recognizes the trial court as the finder of fact and takes into consideration that it observed the witnesses. *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001).

■ In determining whether a criminal defendant's motion to dismiss for insufficient evidence should be sustained, the State is entitled to have all of its relevant evidence accepted as true, the benefit of every inference that reasonably can be drawn from the evidence, and every controverted fact resolved in its favor. *State v. Canady*, 263 Neb. 552, 641 N.W.2d 43 (2002).

■ Whether jury instructions given by a trial court are correct is a question of law. *State v. Putz, ante* p. 37, 662 N.W.2d 606 (2003). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *State v. Tyma*, 264 Neb. 712, 651 N.W.2d 582 (2002).

■ Plain error will be noted only where an error is evident from the record, prejudicially affects a substantial right of a litigant, and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003).

■ In reviewing a sentence of death on appeal, the Nebraska Supreme Court conducts a de novo review of the record to determine whether the aggravating and mitigating circumstances

support the imposition of the death penalty. *State v. Dunster*, 262 Neb. 329, 631 N.W.2d 879 (2001), *cert. denied* 535 U.S. 908, 122 S. Ct. 1210, 152 L. Ed. 2d 147 (2002).

■ At oral argument before this court, the State argued there is a conflict in our cases regarding the appropriate standard of review of a determination whether an individual is "in custody" for purposes of *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966). See, *State v. Dallmann*, 260 Neb. 937, 621 N.W.2d 86 (2000); *State v. Burdette*, 259 Neb. 679, 611 N.W.2d 615 (2000). Compare, *State v. Brouillette*, 265 Neb. 214, 655 N.W.2d 876 (2003); *State v. Faber*, 264 Neb. 198, 647 N.W.2d 67 (2002); *State v. Ildefonso*, 262 Neb. 672, 634 N.W.2d 252 (2001). In this opinion, we reaffirm that in reviewing a motion to suppress statements to determine whether an individual was "in custody" for purposes of *Miranda*, findings of fact as to the circumstances surrounding the interrogation are reviewed for clear error, and the determination whether a reasonable person would have felt that he or she was or was not at liberty to terminate the interrogation and leave is reviewed de novo. *Dallmann, supra*; *Burdette, supra*. Accord, *U.S. v. Deaton*, 328 F.3d 454 (8th Cir. 2003); *U.S. v. Axsom*, 289 F.3d 496 (8th Cir. 2002) (collecting cases).

## IV. ANALYSIS

### 1. MOTIONS TO SUPPRESS

Mata's first three assignments of error are based on his pretrial motions to suppress evidence, which were in part sustained, and in part overruled by the district court. Mata's first argument is that the district court should have suppressed the entirety of the statements Mata made during his March 16, 1999, interrogation.

### (a) Interview

As previously noted, police executed a search warrant at Monica's residence during the evening of March 16, 1999. When police entered the residence, Mata was restrained and handcuffed. The handcuffs were removed, and Mata was asked to come to the police station to be interviewed regarding Adam's disappearance. Mata was interviewed by Robert Kinsey of the Scottsbluff police department and Ronald Rawalt of the Federal Bureau of

Investigation. Both Rawalt and Kinsey testified that Mata was asked to come to the police station voluntarily and was told that he was not under arrest. Rawalt testified that they explained to Mata that they "needed to interview" Mata and that they

> needed a place to talk to him, to conduct the interview, and that we could not do it at the house, because the search warrant was being served, and that he was not under arrest, and that he did not have to accompany us, but we wanted him to go with us and speak to us at the police station.

Mata was not given *Miranda* warnings at this time, or at any subsequent time relevant to the March 16 interview.

Rawalt testified that once at the police station, the door to the interview room was left unlocked, and that he explained to Mata that the door was unlocked and that Mata was free to leave at any time. Rawalt and Kinsey questioned Mata regarding the sequence of events prior to Adam's disappearance and about what Mata thought might have happened to Adam. Mata became increasingly evasive during the interview, refusing to answer certain questions, and stating at one point that he did not "want to answer no more questions." Rawalt and Kinsey continued to question Mata, until Mata specifically said, "hey man, I will plead the fifth right now man, right now." Nonetheless, Mata was further questioned.

The district court sustained Mata's motion to suppress in part. The court determined that the interrogation was not custodial. The court noted that both the testimony of Rawalt and Kinsey, and the transcript of the interview with Mata, demonstrated that Mata was repeatedly informed that he was free to leave. The court found that Mata's initial refusals to answer questions were not indications that Mata was trying to stop the interview. However, the court found that the tone of the questioning changed and became more accusatory, and then Mata specifically invoked the Fifth Amendment. The court determined that at that point, Rawalt and Kinsey should have known that Mata was no longer submitting to questioning. The court suppressed the statements made by Mata after that point. Mata's appellate argument is that the entire interview should have been suppressed, because it was custodial interrogation prior to Mata's being advised of his *Miranda* rights. The State did not appeal,

nor has the State cross-appealed, from the suppression of the remainder of the interview.

Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), prohibits the use of statements stemming from the custodial interrogation of a defendant unless the prosecution demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. *State v. Dallmann*, 260 Neb. 937, 621 N.W.2d 86 (2000). *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000). *Miranda* warnings are required only where there has been such a restriction on one's freedom as to render one "in custody." *State v. Brouillette*, 265 Neb. 214, 655 N.W.2d 876 (2003). One is in custody for purposes of *Miranda* when there is a formal arrest or a restraint on one's freedom of movement to the degree associated with such an arrest. *Brouillette, supra.* Two inquiries are essential to the determination whether an individual is in custody for *Miranda* purposes: (1) an assessment of the circumstances surrounding the interrogation and (2) whether a reasonable person would have felt that he or she was not at liberty to terminate the interrogation and leave. *Dallmann, supra.*

The record in this case supports the district court's finding that Mata was informed, more than once, that he was not under arrest and was free to leave at any time. What is dispositive in determining whether *Miranda* warnings should have been given is whether a reasonable person would have felt free to leave under the circumstances. See *Dallmann, supra.* Here, Mata was repeatedly told, expressly, that he was free to leave, and he in fact did leave at the conclusion of the interview.

Mata argues on appeal that the actions of the officers who entered Monica's residence and handcuffed him amounted to a functional "arrest," which rendered the subsequent interrogation custodial. However, the record also reflects that prior to transportation to the police station, Mata was told that he did not have to go, and that he was told at the police station that he could leave at any time. Mata "came voluntarily to the police station, where he was immediately informed that he was not under arrest." See

*Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 50 L. Ed. 2d 714 (1977).

> Such a noncustodial situation is not converted to one in which *Miranda* applies simply because a reviewing court concludes that, even in the absence of any formal arrest or restraint on freedom of movement, the questioning took place in a "coercive environment." Any interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime. But police officers are not required to administer *Miranda* warnings to everyone whom they question. Nor is the requirement of warnings to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him "in custody." It was *that* sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

(Emphasis in original.) *Mathiason*, 429 U.S. at 495.

In *U.S. v. Axsom*, 289 F.3d 496, 500 (8th Cir. 2002), the U.S. Court of Appeals for the Eighth Circuit applied "six common indicia of custody which tend either to mitigate or aggravate the atmosphere of custodial interrogation." The Eighth Circuit described three indicia as mitigating, militating against the existence of custody at the time of questioning: (1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest; (2) whether the suspect possessed unrestrained freedom of movement during questioning; or (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions. *Id.* The Eighth Circuit described the remaining three indicia as aggravating the existence of custody if present: (1) whether strong-arm tactics or deceptive stratagems were used during questioning, (2) whether the atmosphere of the questioning was police dominated, or

(3) whether the suspect was placed under arrest at the termination of the proceeding. *Id.*

We find these indicia to be helpful in our de novo review of the record in the instant case. As described above, it is evident that all three mitigating indicia are present in the facts of this case. Mata was repeatedly told that he was free to leave and was not considered to be under arrest. There is no evidence of restrictions placed on Mata's movement during questioning. Mata also went, voluntarily, to the police station to be interviewed. Furthermore, only one of the aggravating indicia is present. Given that the interview was conducted at the police station, it is reasonable to conclude that the atmosphere was "police dominated." See *id.* at 500. However, the record reveals no strong-arm tactics or deception on the part of the officers, and Mata was allowed to leave at the termination of the questioning. On our de novo review of the record, we conclude, as did the district court, that a reasonable person, under the circumstances given, would have been aware that he was free to leave. The court correctly concluded that Mata's interrogation was not custodial for *Miranda* purposes.

Mata also argues that the interrogating officers failed to " 'scrupulously honor' " his invocation of the Fifth Amendment and that Mata indicated a desire to remain silent prior to his literal taking of " 'the fifth.' " Brief for appellant at 41-42. Once an accused invokes his or her constitutional rights to remain silent and to the services of an attorney, the authorities must refrain from initiating further conversations and must scrupulously honor the accused's request. *State v. Garza,* 241 Neb. 934, 492 N.W.2d 32 (1992). The requirement that law enforcement authorities must respect a person's exercise of the right to cut off questioning counteracts the coercive pressures of the custodial setting. *Michigan v. Mosley,* 423 U.S. 96, 96 S. Ct. 321, 46 L. Ed. 2d 313 (1975). Therefore, although *Miranda* does not require an absolute halt to all conversations by the police with an accused once the right to silence is asserted, observance of the constitutional right is tested by the circumstances to determine whether the right was scrupulously honored. See *State v. Pettit,* 227 Neb. 218, 417 N.W.2d 3 (1987). See, also, *Mosley, supra.*

We note, initially, that the police are not required to accept as conclusive any statement or act, no matter how

ambiguous, as a sign that a suspect desires to cut off questioning. *State v. LaChappell*, 222 Neb. 112, 382 N.W.2d 343 (1986). See, also, *Davis v. United States*, 512 U.S. 452, 114 S. Ct. 2350, 129 L. Ed. 2d 362 (1994). Resolution of ambiguity in the invocation of the constitutional right to remain silent is a question of fact, see *LaChappell, supra*, and given the context in which the statements were made, we cannot say the district court's conclusion was clearly erroneous. Generally, Mata's answers to questions, while voluntary, were evasive and unclear, and taken in context, Mata's statements can be read as frustration with particular questions rather than clearly stated intent to end the interview. Certainly, had Mata really wished to terminate the interview, he could have walked out the door.

More significantly, however, because Mata's alleged invocation of the Fifth Amendment was not made in the context of a custodial interrogation, the police were under no obligation to "scrupulously honor" Mata's ambiguous statements purporting to cut off questioning. The U.S. Supreme Court stated in *Miranda v. Arizona*, 384 U.S. 436, 473-74, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966):

> Once warnings have been given, the subsequent procedure is clear. If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise. Without the right to cut off questioning, the setting of in-custody interrogation operates on the individual to overcome free choice in producing a statement after the privilege has been once invoked.

In *McNeil v. Wisconsin*, 501 U.S. 171, 111 S. Ct. 2204, 115 L. Ed. 2d 158 (1991), the defendant argued that an invocation of his Sixth Amendment right to counsel also acted as an invocation of his *Miranda* right to counsel. The Court held that invocation of a defendant's Sixth Amendment right to counsel does not operate as a *Miranda* invocation of the right to counsel, stating:

> We have in fact never held that a person can invoke his *Miranda* rights anticipatorily, in a context other than

"custodial interrogation"—which a preliminary hearing will not always, or even usually, involve . . . . If the *Miranda* right to counsel can be invoked at a preliminary hearing, it could be argued, there is no logical reason why it could not be invoked by a letter prior to arrest, or indeed even prior to identification as a suspect. Most rights must be asserted when the government seeks to take the action they protect against. The fact that we have allowed the *Miranda* right to counsel, once asserted, to be effective with respect to future custodial interrogation does not necessarily mean that we will allow it to be asserted initially outside the context of custodial interrogation, with similar future effect.

*McNeil*, 501 U.S. at 182 n.3.

Based on *McNeil*, state and federal courts to have confronted the question have concluded that *Miranda* rights cannot be invoked outside the context of custodial interrogation. See *State v. Relford*, 9 Neb. App. 985, 623 N.W.2d 343 (2001) (collecting cases). See, e.g., *U.S. v. Bautista*, 145 F.3d 1140 (10th Cir. 1998); *U.S. v. Grimes*, 142 F.3d 1342 (11th Cir. 1998); *Springer v. Com.*, 998 S.W.2d 439 (Ky. 1999); *Sapp v. State*, 690 So. 2d 581 (Fla. 1997); *State v. Carroll*, 138 N.H. 687, 645 A.2d 82 (1994); *State v. Lang*, 176 Ariz. 475, 862 P.2d 235 (Ariz. App. 1993).

 We agree. As the above-cited courts have noted, allowing anticipatory invocation of *Miranda* rights stretches *Miranda* far beyond its boundaries and the balance between individual rights and effective law enforcement that it sought to protect. *Miranda* is specifically based upon, and limited to, the coercive context of custodial interrogation. We hold that *Miranda* rights cannot be anticipatorily invoked prior to or outside the context of custodial interrogation.

With this principle established, it is clear that Rawalt and Kinsey could not have failed to scrupulously honor Mata's *Miranda* rights, because absent custodial interrogation, *Miranda* was not implicated. Mata's unwillingness to answer questions, ambiguous or otherwise, could not have been an effective invocation of *Miranda* rights. Mata's argument is without merit, as is his first assignment of error.

### (b) Seizure of Boots

At the conclusion of the March 16, 1999, interview, Mata was asked to remove his boots. Rawalt had told Mata to "go ahead and take off," and Mata had asked if he could make a call for someone to come and pick him up. Rawalt and Kinsey then asked for Mata's boots, and Kinsey offered to give Mata a ride or allow Mata to call for a ride. Kinsey testified that Mata "had no problem with" the request for his boots "and immediately took the boots off and gave them to me." Adam's blood was found on Mata's boots.

The district court concluded that Mata gave consent to the seizure of the boots. The right to be free from an unreasonable search and seizure, as guaranteed by the 4th and 14th Amendments to the U.S. Constitution and by article I, § 7, of the Nebraska Constitution, may be waived by the consent of the citizen. *State v. Dallmann*, 260 Neb. 937, 621 N.W.2d 86 (2000). To be effective under the Fourth Amendment, consent to a search must be a free and unconstrained choice and not the product of a will overborne. Consent must be given voluntarily and not as the result of duress or coercion, whether express, implied, physical, or psychological. *State v. Tucker*, 262 Neb. 940, 636 N.W.2d 853 (2001). Voluntariness of consent to search is a question of fact to be determined from all the circumstances. *Id.*

Mata argues that his consent was not voluntary, because it was given at the conclusion of an involuntary interrogation. This argument is without merit. First, we note that Mata's contention that he was subjected to custodial interrogation was rejected above. Furthermore, as noted by the district court, Mata surrendered his boots after he had been told that the interview was over and that he should go. The record supports the court's factual determination that given all the circumstances, Mata gave voluntary consent to the seizure of his boots. Mata's second assignment of error is without merit.

### (c) Necropsy of Dog

As previously noted, during the execution of the search warrant on the evening of March 16, 1999, Monica was asked to remove a dog from the residence. The next day, Rawalt spoke to Monica and told her that police had decided to x-ray the dog and that the

dog might be euthanized. Monica told Rawalt that the dog was at Cruz' house. Monica testified that Rawalt told her why police wanted to check the dog, and Monica told Rawalt to "[g]o ahead" and check the dog, and that she did not want the dog back. The dog was seized from Cruz' residence without a warrant. Police took the dog to be x-rayed, and a bone was seen in the digestive tract of the dog. It was determined that the only way to retrieve the bone was to euthanize the dog.

Kinsey testified that he had been uncertain whether the dog belonged to Monica or to her son and that he had learned that the dog belonged to Monica's son. The transcript of Monica's interview with Kinsey contains references to her son's feeding "his" dog. Monica testified expressly that Mata had given the dog to her son and that Mata fed the dog "now and then, but he really didn't pay attention to it."

The district court found that Mata had purchased the dog, but had given the dog to Monica's son, and that Monica, as the mother of her son, had the legal right to dispose of the dog. The court also determined that because Mata neither owned the dog nor had an expectation of privacy regarding the dog, Mata had no standing to contest its seizure. We note, although it is not contested by the State, that privately owned animals are "effects" subject to the protections of the Fourth Amendment. See *Altman v. City of High Point, N.C.,* 330 F.3d 194 (4th Cir. 2003) (collecting cases).

Before one may challenge a nonconsensual search without a warrant, one must have standing in a legal controversy. *State v. Conklin,* 249 Neb. 727, 545 N.W.2d 101 (1996). A "standing" analysis in the context of search and seizure is nothing more than an inquiry into whether the disputed search and seizure has infringed an interest of the defendant in violation of the protection afforded by the Fourth Amendment to the U.S. Constitution. *State v. Konfrst,* 251 Neb. 214, 556 N.W.2d 250 (1996). To determine whether an individual has an interest protected by the Fourth Amendment to the U.S. Constitution and Neb. Const. art. I, § 7, one must determine whether the individual has a legitimate or justifiable expectation of privacy in the invaded place. Ordinarily, two inquiries are required. First, the individual must have exhibited an actual (subjective) expectation

of privacy, and second, the expectation must be one that society is prepared to recognize as reasonable. *State v. Lara*, 258 Neb. 996, 607 N.W.2d 487 (2000).

The premise of Mata's argument on appeal is that because the dog was originally located at Monica's residence, which Mata shared, he had a reasonable expectation of privacy in the contents of the residence. Mata then argues that when Monica removed the dog from the residence, at the direction of law enforcement, she was doing so as an agent of law enforcement. Mata then concludes by arguing that when the dog was taken from Cruz' residence the next day, it was a warrantless seizure. We first note that this argument differs from that made to the district court, where Mata contended that he actually owned the dog. An issue not presented to or decided on by the trial court is not an appropriate issue for consideration on appeal. *State v. Buckman*, 259 Neb. 924, 613 N.W.2d 463 (2000).

Even if we consider Mata's argument, however, it is without merit. Although police asked Monica to remove the dog from the home, Monica had the legal right to do so. Mata argues that this made Monica an agent of the police, such that they were engaged in a "joint endeavor" subject to the constitutional safeguard against an unreasonable search or seizure. See *State v. Abdouch*, 230 Neb. 929, 941, 434 N.W.2d 317, 325 (1989). Resolution of whether an individual is acting as an agent of law enforcement is a question of fact determined by the totality of the circumstances. See, *Coolidge v. New Hampshire*, 403 U.S. 443, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971); *State v. Sardeson*, 231 Neb. 586, 437 N.W.2d 473 (1989); *People in Interest of P.E.A.*, 754 P.2d 382 (Colo. 1988) (en banc). The defendant has the burden of establishing that a private individual acted as an agent of law enforcement. *People v. P.E.A., supra.* Cf. *Sardeson, supra.*

There is no factual basis in the record to support Mata's assertion that Monica was acting as an agent of law enforcement. There is a difference between acting as an agent of law enforcement and simply cooperating with a reasonable request made by law enforcement during a legal search. On the record before us, there is no suggestion that Monica's removal of the dog from the residence was intended to facilitate its seizure by law enforcement, as opposed to being in Monica's self-interest to recover

her child's property. See *Gundlach v. Janing*, 401 F. Supp. 1089 (D. Neb. 1975), *aff'd* 536 F.2d 754 (8th Cir. 1976).

Just as significant is the fact that even if an agency relationship had been established, Monica engaged in no conduct that would violate the Fourth Amendment. If a private citizen has the right to search in a particular place or seize certain property by virtue of his or her own personal relationship to the premises or property in question, that right is not diminished by the individual's relationship with law enforcement. See, e.g., *U.S. v. Jenkins*, 46 F.3d 447 (5th Cir. 1995); *United States v. West*, 453 F.2d 1351 (3d Cir. 1972); *People v. Heflin*, 71 Ill. 2d 525, 376 N.E.2d 1367, 17 Ill. Dec. 786 (1978); *People v. Thompson*, 25 Cal. App. 3d 132, 101 Cal. Rptr. 683 (1972). Cf. *Coolidge, supra.* The district court concluded, as a factual matter, that the dog legally belonged to Monica. Obviously, even if an agency relationship existed between Monica and the police, it could not encroach on Monica's right to enter her own residence and seize her own property. See *West, supra.*

The record supports the conclusion, based on the facts set forth above, that Monica was the legal owner of the dog and had the right to remove her personal property from her own residence. The dog, when it was seized by law enforcement the next day, was at Cruz' residence, where Mata had no reasonable expectation of privacy and, thus, no standing to object to the seizure. Mata essentially asks this court to conclude that he had a reasonable expectation of privacy regarding someone else's personal property, kept in someone else's home. There is no foundation in law or logic for such a conclusion.

Furthermore, the record supports the district court's findings that Monica, as the legal owner of the dog, had authority to consent to the seizure of the dog the next day and that she did so. Animals are personal property under Nebraska law. *Fackler v. Genetzky*, 257 Neb. 130, 595 N.W.2d 884 (1999). When the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that the consent was given by the defendant, but may show that the permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected. *State v. Konfrst*, 251

Neb. 214, 556 N.W.2d 250 (1996), citing *United States v. Matlock*, 415 U.S. 164, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974). The consent to search given by one who possesses common authority over premises or effects is valid as against the absent, nonconsenting person with whom that authority is shared. *Matlock, supra.* As previously noted, the warrant requirement of the Fourth Amendment can be waived by the consent of the citizen. See *State v. Dallmann*, 260 Neb. 937, 621 N.W.2d 86 (2000). The State sufficiently established that this exception to the warrant requirement was met in this case.

For the foregoing reasons, Mata's third assignment of error is without merit.

## 2. SHACKLES

Prior to trial, Mata filed, and renewed, a motion to not have Mata restrained during the trial. Mata's counsel contended that if Mata was to be restrained, such restraint should be nonvisible. The court suggested that Mata's arms, wrists, and hands would be free, but his legs would be restrained with ankle bracelets, and Mata would be seated in the courtroom before the jury came in. The court concluded that those restraints would not be visible to the jury. Mata's counsel asked if skirting could be placed on the table, presumably to ensure that Mata's feet were hidden, and the court replied that "[i]f you think that is important, that could be done. It wouldn't hurt anything."

Nonetheless, during the jury selection process, the record reflects that Mata was brought into the courtroom after the jury panel was present, that Mata had to walk 15 to 20 feet through the courtroom, and that the shackles would have been visible to the jury panel at that time. However, the shackles, while visible, did not impede Mata's gait while he was walking. Mata was otherwise unrestrained and was in plain clothes, as were the officers in charge of his security. Mata made an in-chambers motion for mistrial shortly thereafter, based on the visibility of the leg restraints, and an alternative motion, absent a mistrial, for the restraints to be removed. The only basis proffered by the State for Mata's restraints was that the charges were severe and that due to a change of venue, Mata's jailers were in "somewhat unfamiliar territory." The court overruled Mata's motions. Mata argues that he was deprived of a constitutionally fair trial.

██ The general rule is that a defendant should be free from shackles unless they are necessary to prevent violence or escape. *State v. Heathman*, 224 Neb. 19, 395 N.W.2d 538 (1986). This is because it is central to the right to a fair trial, guaranteed by the 6th and 14th Amendments, that one accused of a crime is entitled to have his or her guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial. *Holbrook v. Flynn*, 475 U.S. 560, 106 S. Ct. 1340, 89 L. Ed. 2d 525 (1986).

> This does not mean, however, that every practice tending to single out the accused from everyone else in the courtroom must be struck down. Recognizing that jurors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance, we have never tried, and could never hope, to eliminate from trial procedures every reminder that the State has chosen to marshal its resources against a defendant to punish him for allegedly criminal conduct. To guarantee a defendant's due process rights under ordinary circumstances, our legal system has instead placed primary reliance on the adversary system and the presumption of innocence. When defense counsel vigorously represents his client's interests and the trial judge assiduously works to impress jurors with the need to presume the defendant's innocence, we have trusted that a fair result can be obtained.

475 U.S. at 567-68. Certain practices, however, pose such a threat to the fairness of the factfinding process that they must be subjected to close judicial scrutiny. *Id.*

Thus, in *Estelle v. Williams*, 425 U.S. 501, 96 S. Ct. 1691, 48 L. Ed. 2d 126 (1976), the Court held that where a defendant is forced to wear prison clothes when appearing before the jury, the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment, and since no essential state policy was served by compelling a defendant to dress in that manner, the Court concluded that the practice was unconstitutional. However, in *Holbrook, supra*, the Court applied that principle to a situation in which the defendant

objected to the presence of several armed security personnel in the courtroom. The Court stated:

> To be sure, it is possible that the sight of a security force within the courtroom might under certain conditions "create the impression in the minds of the jury that the defendant is dangerous or untrustworthy." . . . However, "reason, principle, and common human experience," . . . counsel against a presumption that any use of identifiable security guards in the courtroom is inherently prejudicial. In view of the variety of ways in which such guards can be deployed, we believe that a case-by-case approach is more appropriate.

475 U.S. at 569. The Court determined that the presence of armed guards in the courtroom did not tend to brand the defendant in such a way as to prejudice his trial. *Id.*

Mata argues that since restraints were not shown to be necessary to prevent his escape, or other breaches of security, the prejudice resulting from the use of visible restraints violated Mata's right to a fair trial. However, the record does not support this conclusion. The record shows that Mata was placed in leg restraints that did not impair his walking and that the restraints, while potentially visible, were not obtrusive in a way that would have drawn the jury's attention. Mata was dressed in ordinary clothing of his own choosing, and the security detail was dressed in civilian clothing as well.

Moreover—stated bluntly—given the evidence adduced at trial, it is difficult to imagine how seeing Mata in leg restraints would have led the jury to believe Mata more likely to be guilty. Even had the jury believed Mata's theory of the case, the defense conceded that Mata participated in the dismemberment of the body of a 3-year-old child and fed that child's remains to a dog. Mata was charged with the murder of that same child. Viewed objectively, given the nature of the charges and Mata's uncontested actions, it could not have surprised the jury that Mata was wearing unobtrusive leg restraints. The restraints could serve only to call the jury's attention to what it already knew—that Mata was charged with a serious crime. When considering the proceedings in their entirety, it is evident that Mata was not additionally stigmatized by the use of leg restraints and was not prejudiced by those restraints in a way

that deprived him of a fair trial. Mata's fourth assignment of error is without merit.

### 3. MOTIONS TO DISMISS/ELEMENTS OF KIDNAPPING

Neb. Rev. Stat. § 28-313 (Reissue 1995) provides:

(1) A person commits kidnapping if he abducts another or, having abducted another, continues to restrain him with intent to do the following:

(a) Hold him for ransom or reward; or

(b) Use him as a shield or hostage; or

(c) Terrorize him or a third person; or

(d) Commit a felony; or

(e) Interfere with the performance of any government or political function.

(2) Except as provided in subsection (3) of this section, kidnapping is a Class IA felony.

(3) If the person kidnapped was voluntarily released or liberated alive by the abductor and in a safe place without having suffered serious bodily injury, prior to trial, kidnapping is a Class II felony.

Mata's fifth and sixth assignments of error relate to this statute. First, Mata argues, somewhat unclearly, that the evidence was insufficient to establish that Mata had kidnapped Adam. However, the evidence shows that Adam's remains, his clothing, and the sleeping bag he had been using as a blanket were all found at Mata's residence. The evidence also shows that although blood was found on Mata's boots, none of Adam's blood was found at Patricia's residence or in Adam's bedroom there. Giving the State the benefit of every inference that reasonably can be drawn from the evidence, see *State v. Canady*, 263 Neb. 552, 641 N.W.2d 43 (2002), the evidence supports the inference that Adam was taken from his bedroom alive and transported to Mata's residence for the purpose of killing him there. This satisfies the statutory requirement that Mata "abduct[ed] another . . . with intent to . . . [c]ommit a felony." See § 28-313(1)(d).

Mata also argues that he was like a parent to Adam. Although the purpose of this argument is not clearly stated by Mata, we assume he is implying that he could not kidnap "his" child. This argument is meritless. While there may be evidence in the

record to support a conclusion that Mata had some sort of parentlike relationship with Adam, there is also evidence to support a conclusion to the contrary, and this dispute is resolved in favor of the State. See *Canady, supra.* Therefore, we reject Mata's fifth assignment of error.

Mata's next assignment of error is that the jury should have been instructed to determine whether Adam was "voluntarily released or liberated alive by the abductor and in a safe place without having suffered serious bodily injury prior to trial," brief for appellant at 53, because, according to Mata, § 28-313(3) is an essential element of the offense that must be submitted to the jury pursuant to *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Initially, we note the absurdity inherent in Mata's argument, given the logical impossibility of concluding that Adam had been released or liberated alive. We also note that Mata failed to object, at the jury instruction conference, to the court's instruction defining the elements of kidnapping. Failure to timely object to jury instructions prohibits a party from contending on appeal that the instructions were erroneous. *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003). Moreover, Mata's own proposed instruction on the elements of kidnapping was, with respect to the complaint he now raises, effectively identical to that given by the court. A defendant in a criminal case may not take advantage of an alleged error which the defendant invited the trial court to commit. *State v. Harms*, 263 Neb. 814, 643 N.W.2d 359 (2002).

However, even if we consider Mata's argument, an identical argument was rejected by this court in *State v. Becerra*, 263 Neb. 753, 758-59, 642 N.W.2d 143, 148 (2002), wherein we stated:

> In *Apprendi v. New Jersey, supra*, the U.S. Supreme Court held that other than a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. The Court stressed that the fact must increase the penalty. The Court made a distinction between facts in aggravation of punishment and facts in mitigation of punishment. The Court stated that when the issue involves mitigating facts under which the defendant can

escape the statutory maximum, core concerns involving the jury and burden of proof requirements are absent. See *id.*

*Apprendi* is inapplicable to [this] case. We have held that § 28-313 creates a single criminal offense and not two separate offenses, even though it is punishable by two different ranges of penalties depending on the treatment accorded to the victim. The factors which determine which of the two penalties is to be imposed are not elements of the offense of kidnapping. The factors are simply mitigating factors which may reduce the sentence of those charged under § 28-313, and their existence or nonexistence should properly be determined by the trial judge. *State v. Hand,* 244 Neb. 437, 507 N.W.2d 285 (1993); *State v. Schneckloth, Koger, and Heathman,* 210 Neb. 144, 313 N.W.2d 438 (1981). Under § 28-313, any factual finding about whether the person kidnapped was voluntarily released affects whether the defendant will receive a lesser penalty instead of an increased penalty. *Apprendi* made clear that it was concerned only with cases involving an increase in penalty beyond the statutory maximum and does not apply to the mitigating factors in § 28-313.

Accord *Garza v. Kenney,* 264 Neb. 146, 646 N.W.2d 579 (2002), *cert. denied* 537 U.S. 1207, 123 S. Ct. 1284, 154 L. Ed. 2d 1051 (2003). We decline to reconsider our holdings in *Becerra* and *Garza,* and reject Mata's assignment of error.

### 4. DOUBLE JEOPARDY

The next assignment of error we consider is that the district court erred in sentencing Mata to life imprisonment for kidnapping, and on the conviction for felony murder—in other words, sentencing Mata both on felony murder and the predicate felony. Mata correctly states that a predicate felony is a lesser-included offense of felony murder for sentencing purposes, such that a defendant cannot be convicted and sentenced for both felony murder and the underlying felony without violating the Double Jeopardy Clause. See, *State v. Bjorklund,* 258 Neb. 432, 604 N.W.2d 169 (2000); *State v. Nissen,* 252 Neb. 51, 560 N.W.2d 157 (1997). See, also, *Harris v. Oklahoma,* 433 U.S. 682, 97 S. Ct. 2912, 53 L. Ed. 2d 1054 (1977).

However, the premise of Mata's argument is a misstatement of the record. In fact, the sentencing order acknowledged that Mata was found guilty of both first degree felony murder and first degree premeditated murder, and that Mata could not be sentenced twice for the same murder. Therefore, the sentencing panel sentenced Mata for first degree premeditated murder, but neither sentenced nor convicted him for the felony murder.

The Double Jeopardy Clauses of both the federal Constitution and the Nebraska Constitution protect against three distinct abuses: (1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense. *State v. Mather*, 264 Neb. 182, 646 N.W.2d 605 (2002). Since Mata is not being subjected to a successive prosecution, the issue here is whether Mata has been sentenced to multiple punishments for the same offense. It is evident that he has not.

The test to be used in determining whether two distinct statutory provisions penalize the same offense is whether each provision requires proof of a fact which the other does not. See *State v. Winkler, ante* p. 155, 663 N.W.2d 102 (2003), citing *Blockburger v. United States*, 284 U.S. 299, 52 S. Ct. 180, 76 L. Ed. 306 (1932). In the context of a successive prosecution, we have stated that when applying this test to separately codified criminal statutes which may be violated in alternative ways, only the elements charged in the case at hand should be compared in determining whether the offenses under consideration are separate or the same for purposes of double jeopardy. *Winkler, supra.* Here, the same principle dictates that only the elements for which the defendant has been punished should be compared to determine if multiple punishments have been imposed for the same offense. See *id.*

Applying that principle to the instant case, it is evident that kidnapping is not a lesser-included offense of first degree premeditated murder, and Mata does not contend that it is. Compare Neb. Rev. Stat. §§ 28-303 (Reissue 1995) and 28-313. The verdict forms clearly reflected the distinction between the two charged theories of first degree murder, and it is apparent that the jury found the State had carried its burden with respect to both of these theories. See, *State v. Walker*, 188 W. Va. 661,

425 S.E.2d 616 (1992); *State v. Villani*, 491 A.2d 976 (R.I. 1985) (explaining importance of clear jury verdict). Compare *Nissen, supra* (theory of first degree murder on which jury relied not clear from record). While two sentences cannot be imposed for the killing of one person, see *State v. White*, 254 Neb. 566, 577 N.W.2d 741 (1998), where only one conviction is possible, the trial court may, in its discretion, select either of the clear alternative verdicts upon which the conviction and sentence may be predicated. See *Bonhart v. U.S.*, 691 A.2d 160 (D.C. 1997). Here, Mata was convicted and sentenced only for first degree premeditated murder and kidnapping. See, *Foster v. State*, 810 So. 2d 910 (Fla. 2002); *State v. Pizzuto*, 119 Idaho 742, 810 P.2d 680 (1991), *overruled on other grounds, State v. Card*, 121 Idaho 425, 825 P.2d 1081 (1991) (no double jeopardy violation where defendant sentenced on only one theory of murder).

Mata, by the express terms of the sentencing order, was convicted and sentenced only for first degree premeditated murder and kidnapping, which are not the same offense under *Blockburger* and *Winkler*. Therefore, the Double Jeopardy Clause is not implicated. Mata's assignment of error is without merit.

### 5. DEATH PENALTY ISSUES

#### (a) Jury Determination of Aggravating Factors—Plain Error

We now turn to Mata's claim that there was plain error in the imposition of the death sentence under *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002). We first addressed the effect of *Ring* on Nebraska's capital sentencing scheme in *State v. Gales*, 265 Neb. 598, 658 N.W.2d 604 (2003), a direct appeal in a capital case, in which the defendant assigned as error the trial court's denial of his motion challenging the constitutionality of Nebraska's capital sentencing statutes and requesting a jury determination of sentencing issues. After the defendant's appeal was perfected, but before it was decided, the U.S. Supreme Court held in *Ring* that its prior decisions in *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), *overruled, Ring, supra*, and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000), were irreconcilable and that *Walton* should therefore be overruled to

the extent that it allowed a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for the imposition of the death penalty. The Court concluded that because Arizona's enumerated aggravating factors operate as " 'the functional equivalent of an element of a greater offense,' " the Sixth Amendment requires that the factors be found by a jury. *Ring*, 536 U.S. at 609.

In *Gales, supra*, we held that under *Griffith v. Kentucky*, 479 U.S. 314, 107 S. Ct. 708, 93 L. Ed. 2d 649 (1987), the new constitutional rule announced in *Ring* was applicable because, due to the pending direct appeal, the defendant's conviction and sentence were not final when *Ring* was decided. We held that *Ring* required, in order to fulfill the guarantee of rights conferred by the Sixth Amendment, that the existence of any aggravating circumstance utilized in the imposition of a sentence of death, other than a prior criminal conviction, must be determined by a jury. *Gales, supra*. We further concluded that in that case, as in the instant case, the jury made no explicit determination that any of the statutory aggravating circumstances existed. See *id.* Consequently, the procedure violated the constitutional principle articulated in *Ring*, and the defendant's death sentences were vacated. *Gales, supra*.

We again addressed the effect of *Ring* in *State v. Lotter, ante* p. 245, 664 N.W.2d 892 (2003). In *Lotter*, however, the defendant's death sentences had become final, and the defendant sought to challenge those sentences in postconviction proceedings. We denied the defendant's motions to vacate his death sentences, based upon our determination that *Ring* did not apply to collateral challenges to sentences which were final when *Ring* was decided. We held that *Ring* announced a new rule of constitutional procedure which did not fall within either of the exceptions set forth in *Teague v. Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), to the principle that such changes in the law do not apply retroactively to final judgments. *Lotter, supra*. Accordingly, we declined to apply *Ring* to the final judgments collaterally attacked in *Lotter*.

The present case comes before us in yet another procedural posture. Unlike *Lotter*, the judgment in the instant case was not yet final at the time that *Ring* was decided, and pursuant to

*Griffith*, the constitutional rule announced in *Ring* and applied to Nebraska law in *Gales* is also applicable to this case. As in *Gales*, the sentencing procedure in the instant case did not comport with the rule announced in *Ring*. However, unlike the defendant in *Gales*, Mata did not argue to the trial court that he was entitled to a jury determination of aggravating circumstances. In the absence of plain error, when an issue is raised for the first time in an appellate court, the issue will be disregarded inasmuch as the trial court cannot commit error regarding an issue never presented and submitted for disposition in the trial court. *State v. Keup*, 265 Neb. 96, 655 N.W.2d 25 (2003). Consequently, the issue before us in the instant case is whether the violation of the constitutional principle articulated in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), constitutes plain error.

An appellate court always reserves the right to note plain error which was not complained of at trial. *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002). Plain error exists where there is error, plainly evident from the record but not complained of at trial, which prejudicially affects a substantial right of a litigant and is of such a nature that to leave it uncorrected would cause a miscarriage of justice or result in damage to the integrity, reputation, and fairness of the judicial process. *Id.*

The error in the instant case is plainly evident from the record under the current state of the law, if not at the time of trial. In *Johnson v. United States*, 520 U.S. 461, 468, 117 S. Ct. 1544, 137 L. Ed. 2d 718 (1997), the U.S. Supreme Court explained that "in a case such as this—where the law at the time of trial was settled and clearly contrary to the law at the time of appeal—it is enough that an error be 'plain' at the time of appellate consideration." The Court observed that to hold otherwise "would result in counsel's inevitably making a long and virtually useless laundry list of objections to rulings that were plainly supported by existing precedent." 520 U.S. at 468. In this case, the settled law at the time of trial was that a jury was not required to find the aggravating circumstances underlying a capital sentence. See, *Walton v. Arizona*, 497 U.S. 639, 110 S. Ct. 3047, 111 L. Ed. 2d 511 (1990), *overruled, Ring, supra*; *State v. Bjorklund*, 258 Neb. 432, 604 N.W.2d 169 (2000). In fact, Mata was sentenced even prior to the decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct.

2348, 147 L. Ed. 2d 435 (2000), the "jurisprudential source of the Sixth Amendment principle" established by *Ring. Lotter, ante* p. 245, 260, 664 N.W.2d 892, 907 (2003). Nonetheless, pursuant to *Ring* and *Johnson*, the error committed was plain for purposes of this appeal.

We also have little difficulty in concluding that a substantial right of Mata's has been prejudicially affected, given the prevailing view that an *Apprendi* violation, for purposes of plain error review, affects a substantial right of the defendant when the outcome of the trial court proceedings has been prejudicially influenced, i.e., the sentence imposed has been increased beyond that authorized by the jury's verdict. See, e.g., *U.S. v. Doe*, 297 F.3d 76 (2d Cir. 2002), *cert. denied* 537 U.S. 1078, 123 S. Ct. 680, 154 L. Ed. 2d 578; *U.S. v. Martinez*, 253 F.3d 251 (6th Cir. 2001); *U.S. v. Robinson*, 250 F.3d 527 (7th Cir. 2001); *U.S. v. Miranda*, 248 F.3d 434 (5th Cir. 2001); *U.S. v. Butler*, 238 F.3d 1001 (8th Cir. 2001). Nor can it be said that the evidence of aggravating circumstances presented in this case is "overwhelming" and "essentially uncontroverted," such that the trier of fact would surely have made the same finding as the sentencing panel. Compare *United States v. Cotton*, 535 U.S. 625, 633, 122 S. Ct. 1781, 152 L. Ed. 2d 860 (2002) (finding *Apprendi* violation was not plain error because evidence of fact increasing penalty was overwhelming and uncontroverted).

We have recently applied the plain error doctrine to correct errors that are, viewed objectively, less threatening to the integrity, reputation, and fairness of the judicial process than the error presented in the instant case. For example, we have held that the use of a defendant's prior convictions to enhance the defendant's sentence absent proof in the record that the prior convictions were obtained at a time when the defendant was represented by counsel or had knowingly waived such right is plain error. *State v. Thomas*, 262 Neb. 985, 637 N.W.2d 632 (2002), *cert. denied* 537 U.S. 918, 123 S. Ct. 303, 154 L. Ed. 2d 203; *State v. Nelson*, 262 Neb. 896, 636 N.W.2d 620 (2001). In *State v. Ildefonso*, 262 Neb. 672, 634 N.W.2d 252 (2001), we found plain error where a defendant was sentenced to life imprisonment for first degree murder and a consecutive term of years for a weapons charge, but his time served was erroneously

credited to the life sentence rather than to the consecutive sentence. We also found plain error where a defendant convicted of driving under the influence of alcohol was erroneously ordered to participate in alcohol assessment as part of the sentencing order, instead of during the presentencing proceedings. *State v. Hansen*, 259 Neb. 764, 612 N.W.2d 477 (2000). We found plain error where a defendant was erroneously sentenced to a term of 2 to 4 years in prison, where the statutory minimum sentence could not exceed 20 months' imprisonment. *State v. Bartholomew*, 258 Neb. 174, 602 N.W.2d 510 (1999).

When compared with the foregoing instances of plain error, it is evident that to ignore the error evident from the record in the instant case would result in damage to the integrity, reputation, and fairness of the judicial process. See *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002). We are not at liberty to ignore the clear instruction of the U.S. Supreme Court. In *State v. Burlison*, 255 Neb. 190, 193, 583 N.W.2d 31, 34 (1998), we stated that " '[t]o use a . . . waiver as a means of ignoring a plain error that results in an unconstitutional incarceration would place form over substance; would damage the integrity, reputation, and fairness of the judicial process; and would render the plain error doctrine . . . meaningless.' " Here, where the unconstitutionally imposed sentence is execution instead of incarceration, this principle is even more compelling. For the foregoing reasons, we conclude that the violation of the constitutional principle articulated in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), and applied to Nebraska law in *State v. Gales*, 265 Neb. 598, 658 N.W.2d 604 (2003), was plain error that we cannot leave uncorrected. Consequently, we must vacate Mata's death sentence due to reversible error in the sentencing proceedings, and remand the cause to the district court for resentencing. See *Gales, supra*, citing *State v. Reeves*, 258 Neb. 511, 604 N.W.2d 151 (2000).

(b) Remaining Assignments
of Error—Sufficiency of Evidence

Because our decision in *Gales* requires that Mata's death sentence be vacated, and the cause remanded for resentencing on the count of first degree premeditated murder, we need not

consider Mata's remaining assignments of error directed at Nebraska's capital sentencing statutes, or his complaints about the particular deficiencies of the procedures followed by the sentencing panel in this case. An appellate court is not obligated to engage in an analysis which is not needed to adjudicate the case and controversy before it. *State v. Lee*, 265 Neb. 663, 658 N.W.2d 669 (2003).

We note, in particular, that Mata has presented this court with a record containing a considerable amount of evidence intended to show that electrocution, as a mode of execution, violates the Eighth Amendment's prohibition on cruel and unusual punishments. We are aware that recent events at the U.S. Supreme Court may cast doubt upon whether that Court will continue to regard electrocution as consistent with the Eighth Amendment. See, *Atkins v. Virginia*, 536 U.S. 304, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002); *Bryan v. Moore*, 528 U.S. 960, 120 S. Ct. 394, 145 L. Ed. 2d 306 (1999) (granting certiorari on question), *cert. dismissed as improvidently granted* 528 U.S. 1133, 120 S. Ct. 1003, 145 L. Ed. 2d 927 (2000) (dismissing certiorari due to legislative enactment of lethal injection); *Campbell v. Wood*, 511 U.S. 1119, 114 S. Ct. 2125, 128 L. Ed. 2d 682 (1994) (Blackmun, J., dissenting from denial of certiorari; Stevens and Ginsburg, JJ., voting to grant stay of execution); *Poyner v. Murray*, 508 U.S. 931, 113 S. Ct. 2397, 124 L. Ed. 2d 299 (1993) (Souter, J., joined by Blackmun and Stevens, JJ., respecting denial of petition for writ of certiorari). However, the possibility remains that Mata will not be resentenced to death, or that the Nebraska Legislature will address this issue prior to the conclusion of Mata's resentencing. See, e.g., L.B. 526, 98th Leg., 1st Sess. Therefore, we do not address Mata's assignment of error regarding electrocution at this time.

Before we discuss the proceedings for Mata's resentencing, however, we do consider Mata's final assignment of error: that the sentence of death was excessive. Nebraska's capital sentencing procedures have the characteristics which the U.S. Supreme Court found to resemble a trial in *Bullington v. Missouri*, 451 U.S. 430, 101 S. Ct. 1852, 68 L. Ed. 2d 270 (1981), and double jeopardy concerns attach at a capital sentencing hearing in Nebraska. *State v. Palmer*, 257 Neb. 702, 600

N.W.2d 756 (1999). Under *Bullington*, a defendant who has been impliedly acquitted of the death penalty cannot again be placed in jeopardy of a capital sentence. While the Double Jeopardy Clauses of the federal and state Constitutions do not protect against a second prosecution for the same offense where a conviction is reversed for trial error, they bar retrial if the reversal is necessitated because the evidence was legally insufficient to sustain the conviction. *State v. Yelli*, 247 Neb. 785, 530 N.W.2d 250 (1995). Therefore, before the cause is remanded for resentencing, we determine whether the evidence presented by the State was sufficient to sustain the conviction. See *State v. Sheets*, 260 Neb. 325, 618 N.W.2d 117 (2000).

A lengthy reexamination of the evidence set forth above is not necessary to dispose of this assignment of error. The evidence indicates that the blunt force trauma inflicted on Adam, and his dismemberment, occurred at or near the time of his death. It suffices to say that based on our de novo review of the record made in this proceeding, we conclude that the evidence was sufficient to conclude that Adam's murder was "especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence" within the meaning of § 29-2523(1)(d), and that this aggravating factor outweighed the mitigating factors supported by the record. Mata has not been "acquitted" of the death penalty under *Bullington*. Mata's final assignment of error is without merit.

(c) Resentencing Proceedings

After the U.S. Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), the Nebraska Legislature enacted 2002 Neb. Laws, L.B. 1, of the 97th Legislature, Third Special Session, " 'to satisfy the new 6th Amendment requirements articulated in *Ring*.' " *State v. Gales*, 265 Neb. 598, 626, 658 N.W.2d 604, 625 (2003). In *Gales*, we determined that the L.B. 1 amendments to the capital sentencing statutes which reassigned responsibility for determining the existence of any aggravating circumstance from judges to juries affected a procedural change in the law which applied to all proceedings which occur on or after November 23, 2002, the effective date of the amendment. Thus, we held that the capital

sentencing procedures as amended by L.B. 1 applied to the new penalty phase proceeding necessitated in that case. *Gales, supra.* We determined, however, that the provision of L.B. 1 which amended the penalty for a Class 1A felony from " 'Life imprisonment' " to " 'Life imprisonment without parole' " was a substantive change that could not be applied to the defendant upon resentencing. *Gales*, 265 Neb. at 633, 658 N.W.2d at 629. Our holding in *Gales* is controlling in the instant case.

We issued our decision in *Gales* after the briefs had been filed, but prior to oral argument in the instant case. Consequently, at oral argument, Mata advanced two arguments with respect to our decision in *Gales* that are not present in his appellate brief. Ordinarily, to be considered by an appellate court, errors must be assigned and discussed in the brief of the one claiming that prejudicial error has occurred. *State v. Dyer,* 245 Neb. 385, 513 N.W.2d 316 (1994). However, an appellate court always reserves the right to note plain error which was not complained of at trial or on appeal. *State v. Hays*, 253 Neb. 467, 570 N.W.2d 823 (1997). Because Mata's appearance at oral argument was his only opportunity to address our decision in *Gales*, we choose to consider and respond to Mata's arguments in that regard.

Mata's first argument with respect to our decision in *Gales* is that we failed to properly consider the decision of the U.S. Supreme Court in *Sattazahn v. Pennsylvania*, 537 U.S. 101, 123 S. Ct. 732, 154 L. Ed. 2d 588 (2003). In that double jeopardy case, a plurality of the Court opined that under *Ring*, since aggravating circumstances " 'operate as "the functional equivalent of an element of a *greater offense*," ' " for Sixth Amendment purposes, "the underlying offense of 'murder' is a distinct, lesser included offense of 'murder plus one or more aggravating circumstances.' " (Emphasis in original.) *Sattazahn*, 537 U.S. at 111, quoting *Ring, supra*. Although Mata's argument is not entirely clear, he seems to be arguing that under *Sattazahn*, he has been convicted of the "lesser offense" of noncapital murder and cannot now be "convicted" of a "greater offense" via a capital resentencing proceeding.

We do not find this argument persuasive. First, we note that the section of *Sattazahn* relied upon by Mata was joined by only

three Justices, and the views expressed by the plurality have not been endorsed by a majority of the Court. See *id.* (O'Connor, J., concurring in part and concurring in the judgment). Furthermore, even if we assume that the plurality's above-quoted discussion in *Sattazahn* is a correct statement of the law, it does not conflict with our decision in *Gales* and does not support the conclusion urged by Mata. Mata stands convicted of capital murder as defined by the *Sattazahn* plurality; but error in the sentencing proceeding resulted in reversible error of the sentencing portion of Mata's final judgment. However, Mata can be resentenced, because he has not been "acquitted" of capital murder as defined by the *Sattazahn* plurality. There is no support in *Ring* or the *Sattazahn* plurality discussion for the proposition that a separate capital resentencing proceeding following a successful appeal violates the Sixth Amendment or the Double Jeopardy Clause.

Mata's second argument with respect to *State v. Gales,* 265 Neb. 598, 658 N.W.2d 604 (2003), is that we erred in concluding that the notice provisions of L.B. 1, which require the State to file a "notice of aggravation" alleging the aggravating circumstances on which the State intends to rely, were not applicable to the resentencing proceedings. We stated:

> The filing of a notice of aggravation is a new procedure established by L.B. 1. There was no such requirement at the time the information in this case was filed, or at any time prior to [the defendant's] trial and original sentencing. Under the former statute, the State was not constitutionally required to provide a defendant with notice as to which particular aggravating circumstance or circumstances it would rely upon in pursuing the death penalty. . . . While procedural statutes do apply to pending litigation, it is a general proposition of law that new procedural statutes have no retroactive effect upon any steps that may have been taken in an action before such statutes were effective. . . . All things performed and completed under the old law must stand. . . . We conclude that because the pretrial and trial "steps" of [the defendant's] litigation were completed and became final at a time when the law did not require the State to file a notice of aggravation in order to

seek the death penalty, this new procedural requirement is not applicable to [the defendant].

(Citations omitted.) *Gales*, 265 Neb. at 635, 658 N.W.2d at 631.

Mata argues that this determination amounts to "overruling" the Legislature with respect to the L.B. 1 notice requirements. This argument is without merit. In fact, our opinion in *Gales* specifically set forth a procedure for resentencing to ensure that although the State could not, as a practical matter, have filed a notice of aggravation prior to a trial that had already taken place, the Legislature's intent, that the defendant be notified prior to sentencing regarding the aggravating factors the State would seek to prove, would be effectuated. We determined that at resentencing, the State could seek to prove only the aggravating circumstances which were determined to exist in the first trial, and of which the defendant was on notice. *Id.*

We are not persuaded by Mata's arguments with respect to our decision in *Gales*; we reaffirm that holding and therefore conclude that our disposition of *Gales* controls our disposition of the instant case as well. Consequently, upon remand for resentencing, the district court is directed to conduct proceedings pursuant to § 29-2520, as amended by L.B. 1, in order to determine whether aggravating circumstances exist with respect to the murder of Adam. See *Gales, supra*. Such determination will be made by a jury impaneled for this purpose, unless waived by Mata. See *id.* The scope of such proceedings will be limited in that the State may seek to prove only the aggravating circumstance which was determined to exist in the first trial. See *id.* Upon completion of this proceeding, the district court is directed to resentence Mata, pursuant to L.B. 1, § 11 (to be codified as § 29-2520(h)), or L.B. 1, §§ 12 and 14 (to be codified as §§ 29-2521 and 29-2522), to a minimum sentence of life imprisonment or a maximum penalty of death.

## V. CONCLUSION

For the foregoing reasons, we affirm Mata's convictions for first degree premeditated murder and kidnapping. We also affirm the sentence of life imprisonment imposed for the kidnapping. However, based on *Ring v. Arizona*, 536 U.S. 584, 122 S. Ct. 2428, 153 L. Ed. 2d 556 (2002), Mata's death sentence is

vacated, and the cause is remanded for resentencing on the charge of first degree premeditated murder, as consistent with this opinion and our opinion in *State v. Gales*, 265 Neb. 598, 658 N.W.2d 604 (2003).

AFFIRMED IN PART, AND IN PART VACATED AND
REMANDED WITH DIRECTIONS FOR NEW PENALTY
PHASE HEARING AND RESENTENCING ON COUNT I.